Roy G. VANASCO and Joseph
Ferris, Plaintiffs,

v.

Arthur H. SCHWARTZ, Individually and
in his capacity as Chairman of the New
York State Board of Elections, et al.,
Defendants.

No. 74 Civ. 1533 (MAC).

E. D. New York.

Robert I. POSTEL, Plaintiff,

v.

Arthur H. SCHWARTZ, Individually and
in his capacity as Chairman of the New
York State Board of Elections, et al.,
Defendants.

No. 74 Civ. 5346 (HFW).

S. D. New York.

United States District Court.

July 14, 1975.

As Amended Aug. 4, 1975.

Judgment Affirmed Jan. 12, 1976.
See 96 S.Ct. 763.

**88**

New York Civil Liberties Union, New York City, by Alan H. Levine, Thomas R. Litwack, New York City, of counsel, American Civil Liberties Union, New York City, by Melvin L. Wulf, New York City, of counsel, Paul H. Asofsky, New York City, for plaintiff Roy G. Vanasco and Joseph Ferris.

Brashich, Finley & Postel, New York City, by Deyan Ranko Brashich, New York City, of counsel, for plaintiff Robert I. Postel.

David E. Blabey, Sp. Counsel, Edward R. Patrick, Deputy Counsel, New York State Board of Elections, Albany, N. Y., Guy L. Heinemann, Chief Attorney, New York City, Stanley L. Zalen, Deputy Attorney, New York City, New York State Board of Elections, New York City, for defendants Arthur H. Schwartz, and others.

## OPINION

Before MOORE, Circuit Judge, and COSTANTINO * and WERKER,** District Judges.

* Of the United States District Court for the Eastern District of New York, sitting by designation in 74 Civ. 5346.

** Of the United States District Court for the Southern District of New York, sitting by designation in 74 Civ. 1533.

1. The Code is officially codified at 9 N.Y. Codes, Rules and Regulations § 6201.1 *et*

WERKER, District Judge.

The New York State Board of Elections ("Board") was created as part of the recently enacted "New York State Campaigns, elections and procedures law" (N.Y. Election Law § 465 *et seq.* (McKinney's Consol. Laws, c. 17, Supp. 1974). Pursuant to its authorized powers under § 472 of the Election Law, the Board promulgated a "Fair Campaign Code" ("Code") for the purpose, *inter alia,* of "stimulating just debate" in political campaigns.[1] Plaintiffs in these two cases have challenged the constitutionality of those sections of the Code (and of the statute, Election Law § 472(a)) which prohibit "during the course of any campaign for nomination or election to public office or party position," by means of "campaign literature, media advertisements or broadcasts, public speeches, press releases, writings or otherwise," "attacks on a candidate based on race, sex, religion or ethnic background" (§ 6201.1(c)); any "misrepresentation of any candidate's qualifications" including the use of "personal vilification" and "scurrilous attacks" (§ 6201.1(d)); any "misrepresentation of a candidate's position" (§ 6201.1(e)); and any "misrepresentation of any candidate's party affiliation or party endorsement" (§ 6201.1(f)).[2] The State argues that the Code and the statute constitute a narrowly drawn regulatory scheme covering an area of unprotected expression. We disagree and hold that the challenged sections of the Code and of the statute are repugnant to the right of freedom of speech guaranteed by the First Amendment and are unconstitutional on their face.

*seq.* (1974). The Code, and section 472 of the N.Y. Election Law (McKinney Supp. 1974) are produced in the appendix to this opinion.

2. While the Code provisions speak in terms of "misrepresentations," the statute (§ 472(a)) uses the term "deliberate misrepresentation."

## I.

Roy Vanasco was the unsuccessful Republican party candidate for the New York State Assembly in the 57th Assembly District. His incumbent opponent filed a complaint with the Board in which he claimed that Vanasco had distributed palm cards using the phrase "Republican-Liberal" when in fact Vanasco was only on the ballot as a candidate of the Republican party. The complaint also alleged that the palm cards implied that Vanasco currently held the position of Assemblyman.[3] After a hearing held on October 16, 1974[4] the Board issued a decision in which it found that the use of the phrase "Republican-Liberal" "misrepresented his [Vanasco's] party endorsement, since he was not the candidate of the Liberal Party" (a violation of § 6201.1(f) of the Code). Concluding that the printing on the palm card "does not clearly indicate that he [Vanasco] is currently an As-

semblyman" the Board refused to find that Vanasco had also violated § 6201.-1(d) of the Code. The Board then ordered Vanasco to surrender all campaign literature which contained the phrase "Republican-Liberal" or to submit a plan for re-marking the literature. Vanasco complied with the Board's order by re-marking his campaign literature.[5]

Joseph Ferris was the Democratic-Liberal candidate for an Assembly seat in the 51st Assembly District. Ferris was elected to office. His incumbent opponent, Vincent Riccio, complained to the Board that Ferris had misrepresented Riccio's voting record in a leaflet distributed by Ferris and by making certain remarks which had been quoted in a newspaper article. The leaflet claimed that Riccio voted himself a $17,000 salary increase; received his salary for less than 100 days work; opposed increased funds for recreation for the aging and opposed aid to community colleges.[6] A

3. Vanasco was a candidate of the Republican Party but was not on the ballot as the candidate of the Liberal Party. The phrase "Republican-Liberal" appeared on palm cards, posters, bumper stickers and dinner invitations that Vanasco had distributed.

In his complaint, Vanasco alleged that he reasonably and in good faith believed that he had the endorsement of the Liberal party. He alleges that through conversations with the Executive Director of the New York State Liberal Party he was told that he could be the Liberal Party candidate for Assemblyman in the 57th Assembly District and that his candidacy was approved by the Executive Committee of the Kings County Liberal Party. Vanasco was unsuccessful in obtaining sufficient signatures on his nominating petitions and was notified by the Board that he would not be listed on the ballot as the Liberal Party Candidate. Despite this, Vanasco alleges that he subsequently received a letter from the Liberal Party's Executive Director which was addressed to him as "Liberal Party Candidate." He also notes that while his campaign literature did contain the Republican symbol (eagle) it did not contain the Liberal Party symbol (bell). Vanasco complaint ¶¶ 9–12. The Board concluded that "[d]espite Vanasco's attempt at gaining Liberal Party endorsement and a Liberal Party line on the ballot, and despite his association with members of the Liberal Party who may have

promoted his candidacy, we hold that his use of the phrase 'Republican-Liberal' in this case misrepresented his party endorsement, since he was not the candidate of the Liberal Party." See Exhibit D–3 to the Vanasco complaint.

4. Vanasco alleges that he was unable to obtain counsel and thus appeared at the hearing without counsel, and that he was not present when his opponent testified. Vanasco complaint ¶ 13.

5. Violation of the Code subjects the respondent to imposition of a $1,000 fine and/or the issuance of a report by the Board. (§ 6201.3(i)(2)–(3)). The Board is also empowered by §§ 472(c) and 469 of the Election Law to obtain an injunction against violations of its orders.

6. The newspaper article appeared in the August 1974 issue of the Home Reporter. Ferris was quoted as stating that Riccio voted "for the gerrymandering of the 51st . . . ." Riccio claimed that he voted against gerrymandering, but Ferris alleges that his remarks referred to an earlier vote. As to the misrepresentations in the leaflet, Ferris alleges that: (1) Riccio did vote for a salary increase but it did not become effective until January 1975; (2) that the New York State Assembly is in session less than 100 days a year; (3) Riccio had opposed a bill (other than the one he support-

hearing was held and a decision filed on November 4, 1974, one day before the election, wherein the Board found that Ferris had misrepresented Riccio's voting record (a violation of § 6201.1(e)) and had done so "with actual knowledge of its falsity or with reckless disregard of its falsity." [7]  Like Vanasco, Ferris was ordered to surrender his campaign literature or submit a plan for re-marking it.  Ferris complied with the Board's order.

On October 29, 1974 Vanasco and Ferris filed suit against the Board in the Eastern District of New York [8] in which they sought the convening of a three-judge court to declare the statute and the Code unconstitutional on their face and as applied to them, and preliminary and permanent injunctive relief against enforcement of the Code and the statute by the Board.  An application for a temporary restraining order was filed and denied and the complaint and application for a three-judge court were dismissed by the district court on October 20, 1974.  The United States Court of Appeals for the Second Circuit denied a motion for a stay pending appeal on November 4, 1974, but on the same day filed a decision reversing the order of the district court and ordered the convening of a three-judge court.  *Vanasco v. Schwartz,* 506 F.2d 524 (2d Cir. 1974).

Plaintiff Robert Postel received a notice from the Board on October 25, 1974, informing him that his opponent for the Democratic nomination for Assemblyman in the 68th Assembly District, A. B. "Pete" Grannis, had filed a complaint with the Board alleging violations of § 6201.1(d) and (f).  Specifically, Grannis charged that certain Postel campaign literature misrepresented that Grannis had a "patronage job" in the State Department of Environmental Conservation;  received major financial support from Republican "big whigs" such as Laurence Rockefeller and Henry Diamond;  that the New York Court of Appeals had directed a new election after having adduced proof that a number of Republicans had voted illegally in a Democratic primary;  that a complaint against Grannis had been filed with the U. S. Commission on Civil Rights and that Grannis was a registered Republican in 1973.[9]

---

ed) dealing with increased funds for recreation of the aging; and (4) Riccio had voted in favor of budgets which had the effect of reducing aid to community colleges.  Ferris complaint ¶¶ 22–23.

7. The Board found that the leaflets contained misrepresentations and that "[i]n the absence of any proof offered by the respondent by way of explanation or defense, and based on all the evidence adduced at the hearing  .  .  .  the respondent Ferris utilized the language in the literature described above with actual knowledge of its falsity and with reckless disregard of its falsity."  See Exhibit F, Ferris complaint.

8. The suit claimed violations of 42 U.S.C. § 1983 with jurisdiction based on 28 U.S.C. §§ 1343 and 2201.  Convocation of a three-judge court was moved pursuant to 28 U.S. C. §§ 2281 and 2284.

9. In his complaint to the Board, Grannis alleged: that his position with the State Department of Environmental Conservation was based on qualification and merit and

was not a patronage job; that as to major support from Republican "big whigs," Mr. Diamond made a contribution of $100 and that Laurence Rockefeller was a registered Democrat and fellow environmentalist; the new primary election was ordered because non-democratic votes had been cast without any finding as to the party affiliation of the non-democrats; and that he was unaware of any complaint filed with the United States Commission on Civil Rights.  See Exhibit 2 attached to the Postel complaint.  In ¶ 16 of his complaint Postel alleges: "In point of fact, according to the records of the Board of Elections and other documents, GRANNIS was a registered Republican as of 1973, was an appointed non-selective service employee of the State Department of Environmental Conservation, was supported by Laurence Rockefeller and Henry Diamond and that they were two of 18 largest contributors of approximately 350 individuals in GRANNIS' campaign, and that a complaint had been in fact filed with the United States Commission on Civil Rights at Washington, D. C."

Postel's hearing before the Board was started on October 25, 1974 and continued on October 26. By an interim order dated October 28, Postel was ordered to cease and desist the distribution of any and all literature containing any language complained of in the proceeding before the Board. Before his hearing was continued, Postel filed suit in the Southern District of New York in which he asked for relief similar to that in Vanasco and Ferris' suit.[10] The District Court granted Postel's application for a temporary restraining order against further Code hearings by the Board. Subsequently, this three-judge court was convened and ordered to consider both the Postel and Vanasco and Ferris cases. At a pre-trial conference held on March 20, 1975 it was agreed that the Court would consider a facial attack on the constitutionality of the Code. All parties have now moved for summary judgment.

## II.

Before considering the specifically challenged sections of the Code and the statute, the fundamental question which must be answered is: To what extent may a state regulate the speech of those persons who are seeking public office? The plaintiffs argue that only those "well-defined and narrowly limited" classes of speech including the "lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace,"[11] fall outside the protection of the First Amendment. The asserted target of several of the Code sections—the deliberate calculated falsehood—would in plaintiffs' view be constitutionally protected speech. According to plaintiffs, the answer to false campaign speech does not lie in regulation by the state but rather in criticism and rebuttal in the "marketplace of ideas." See Whitney v. California, 274 U.S. 357, 375–77, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Far from enhancing the political process, regulation of campaign speech will in plaintiffs' words "undermine its most powerful safeguard."

■ While recognizing that the First Amendment enjoys a "preferred position" among those rights guaranteed by the Constitution, the Board contends that the statute and the Code prohibit only that expression which is unprotected by the First Amendment. Unprotected speech, the Board argues, would include those statements made "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." New York Times v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Whether the deliberate false statement is the basis of a civil defamation suit by a public official (Times) or a "public figure" (Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)) or of a criminal libel prosecution (Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)) or, as in these cases, regulation of campaign speech by the state, the Board argues that if the statement is made with "actual malice" then it does not enjoy constitutional protection. We agree with this position.

Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), in our view, answers plaintiffs' argument that the deliberate false statement is constitutionally protected speech when uttered during the course of a political campaign. There the Court noted:

"That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic

10. Postel also sought $1,000,000 in damages but at pre-trial conference that demand was withdrawn.

11. Chaplinsky v. New Hampshire, 315 U.S. 568, 572–73, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .' *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 [62 S. Ct. 766, 86 L.Ed. 1031]. Hence the knowingly false statement and the false statement made with the reckless disregard of the truth, do not enjoy constitutional protection." 379 U. S. at 75, 85 S.Ct. at 216.

*See also, Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1, 18–19 (1965); Hastie, Free Speech: Contrasting Constitutional Concepts and Their Consequences, 9 Harv.Civ.Rights–Civ.Lib.L.Rev. 428, 447 (1974).

The decisions in *Times* and *Garrison* and other related cases [12] emphasize the necessity for statements concerning public issues to command a high degree of constitutional protection so that debate may be "uninhibited, robust, and wide-open." It is that standard of protection and not the narrow area of unprotected speech which they define that constitutes the real significance of the *Times* line of cases. *See* Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191, 204–10. The *Times* standard of constitutional protection, in the words of Justice Powell, "administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).

■ It is important to emphasize here a proposition with which the Board agrees, *i. e.,* that any state regulation of campaign speech must be premised on proof and application of a *Times* "actual malice" standard. We are not dealing with defamation suits brought by "private individuals" where a standard somewhat less than that required by *Times* would be appropriate. *See Gertz v. Robert Welch, Inc., supra,* at 339–48, 94 S.Ct. 2997.[13] To the contrary, Board

12. The *Times* "actual malice" standard has also been applied to the dismissal of a public school teacher based on false statements made by the teacher in discussing issues of public importance, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968), and to suits for invasion of privacy based on false statements where a matter of public interest was involved. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). *See also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). While a plurality of the Court applied the *Times* standard to a libel action involving an event of public interest brought by a private person; *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), that extension was modified in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See note 13, infra.*

13. In *Gertz,* the Court refused to extend the *Times* standard to the publisher of defamatory falsehoods where the individual defamed was not a public official or a public figure but rather a private individual, even though an issue of public or general interest was involved. Writing for a majority of the Court, Mr. Justice Powell concluded: "[W]e believe that the *New York Times* rule states an accommodation between this concern [the interest of the press and broadcast media in immunity from liability] and the limited state interest present in the context of libel actions brought by public persons. For the reasons stated below we conclude that state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." 418 U.S. at 343, 94 S.Ct. at 3008. The Court went on to hold that "[S]o long as they do not impose liability without fault, the States may define for themselves the ap-

proceedings concern regulation of the speech of "public officers" and "public figures" during campaigns for political office where the constitutional guarantee of freedom of speech "has its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1970). With this proposition in mind, we can agree with the Board's argument that calculated falsehoods are of such slight social value that no matter what the context in which they are made, they are not constitutionally protected.

Our discussion of course has so far existed on a theoretical level. We now focus on the contours of New York's regulations. As we do, we bear in mind the necessity for legislators to use only the most "sensitive tools" in separating legitimate from illegitimate speech, *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1957) so that First Amendment freedoms are given the necessary "breathing space" they

need to survive. *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

### III.

By enacting a Fair Campaign Code, New York joined a growing list of states that now regulate campaign speech. See Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1272–1298 (1975).[14] The Code is comprehensive and covers not only various forms of "misrepresentations" and "unethical speech," but also certain practices of "political espionage" (§ 6201.1(a)); "acts intended to hinder or prevent any eligible person from registering to vote" (§ 6201.1(h)); and use of public opinion polls (§ 6201.2). There are detailed provisions relating to the filing of complaints and answers with the Board (§ 6201.3(a)–(c)), and for the conducting of adversary hearings where a respondent may have counsel present, may cross-examine witnesses and may have

propriate standard for liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010 (footnote omitted). In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974) the Court remarked that it had "no occasion to consider whether a state may constitutionally apply a more relaxed standard of liability for a publisher or broadcaster of false statements injurious to a private individual under a false-light theory of invasion of privacy, or whether the constitutional standard announced in *Time, Inc. v. Hill* applies to all false-light cases. *Cf. Gertz v. Welch, Inc.*, 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789]." *Id.* at 250, 95 S.Ct. at 469.

14. This Note at 1273 n. 218 lists the following statutory and regulatory enactments:
"Alaska Stat. § 15.55.040 (Supp.1974); Ind.Code § 3–1–30–11 (1971); Mass.Gen. Laws Ann. ch. 56, § 42 (Supp.1975); Mich.Comp.Laws Ann. § 168.915 (1967); Minn.Stat. §§ 210.11, 211.08 (1971); Miss.Code Ann. § 23–3–33 (1972); Mont. Rev.Codes Ann. § 23–4754 (Supp.1974); N.Y.Elec.Law § 472 (McKinney Supp. 1974), *implemented by* 9 *N.Y.Codes, Rules & Regulations* § 6201.1 (1974); N.C.Gen. Stat. § 163–274(8) (1972); N.D.Cent. Code § 16–20–17.3 (1971); Ohio Rev.Code Ann. § 3599.09(B) (Page 1972); Or.

Rev.Stat. § 260.532 (1973); Tenn.Code Ann. § 2–1950 (Supp.1974); Utah Code Ann. § 20–14–28 (1969); Wash.Rev.Code Ann. § 29.85.070 (1965); W.Va.Code Ann. § 3–8–11(e) (1971); Wis.Stat. § 12.17 (1971). *See also* Hawaii Rev.Stat. § 11–194(b)(4) (Supp.1974), *implemented* by Rules Implementing Election Campaign Contributions and Expenditures Act, Hawaii Campaign Spending Commission, Rule 2.2, Exhibit A (May 2, 1974) . . . .
Some states have statutes regulating more limited classes of false statements. *See* Cal.Elec.Code § 12052 (West 1961) (false claim of incumbency); Hawaii Rev.Stat. § 19–3(6) (Supp.1974) (falsely attributed candidate withdrawal statement); Mass.Gen.Laws Ann. ch. 56 § 43A (1958) (fraudulent use of word 'veteran' by candidate); Minn.Stat. § 211.081 (1971) (false claim of party support); Miss.Code Ann. § 23–1–9 (1972) (false claim of party support) (provision may be invalid under Voting Rights Act of 1965 . . . .); Or.Rev.Stat. § 260.542 (1973) (use of word "re-elect" by non-incumbent); 9 N.Y.Codes, Rules & Regulations § 6201.1(d) (1974) (same); *id.* § 6201.-1(f) (use of fraudulent or untrue endorsement)."

Variations in the statutes are discussed at pp. 1273–75 of the same Note.

the Board subpoena witnesses for him (§ 6201.3(d)–(e)). The Board can impose a fine of up to $1,000 for each violation and/or issue a report setting forth its findings and determinations (§ 6201.3(i)(2)–(3)). In addition, by § 472(c) of the Election Law, the Board is empowered to institute judicial proceedings to enforce its orders. With this broad legislative scheme in the background, we begin an analysis of those Code sections specifically challenged by the plaintiffs.

*Attacks on a candidate based on race, sex, religion, or ethnic background. (§ 6201.1(c)).*

██ The Board admits that this section of the Code (as well as § 472(a) of the Election Law, which contains the same prohibition) was not intended to be, and is not, limited by a *Times* "actual malice" standard. It is a blanket prohibition against any attacks on a candidate's race, sex, religion or ethnic background. Justification for such a sweeping prohibition rests on the assumption that this Code section focuses only on attributes which are completely unrelated to any candidate's "fitness for office." Such an assumption is an exercise in self-delusion. The Supreme Court has recognized that "[g]iven the realities of our political life, it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 275, 91 S.Ct. 621, 627, 28 L. Ed.2d 35 (1970). Attempts to create a "public sector"—"private sector" dichot-

omy were characterized as "syllogistic manipulation[s]" by the Court. 401 U. S. at 273, 91 S.Ct. 621. It would be a retreat from reality to hold that voters do not consider race, religion, sex or ethnic background when choosing political candidates. Speech is often provocative and indeed offensive, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), but unless it falls into one of those "well defined and narrowly limited classes" of unprotected speech (e. g., "fighting words") it enjoys constitutional protection. New York's attempt to eliminate an entire segment of protected speech from the arena of public debate is clearly unconstitutional.[15]

*Misrepresentations*

██ Three sections of the Code specifically challenged by plaintiffs prohibit "misrepresentations of any candidate's qualifications" (§ 6201.1(d)); "misrepresentation of any candidate's position" (§ 6201.1(e)); and "misrepresentation of any candidate's party affiliation" (§ 6201.1(f)). As to these sections the Board contends that the statute and the Code are narrowly drafted so that only the deliberate calculated falsehood—unprotected speech—is the subject of regulation. We disagree and hold that these sections of the Code and that part of § 472(a) of the Election Law have not been so carefully drawn or authoritatively construed so as to regulate only

15. The Board, in a footnote in its brief, also cites *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), as support for the validity of this Code section. In *Times, supra* 376 U.S. at 268, 84 S.Ct. at 719 the Court discussed *Beauharnais* as follows: "the Court sustained an Illinois criminal libel statute as applied to a publication held to be both defamatory of a racial group and 'liable to cause violence and disorder.' But the Court was careful to note that it 'retains and exercises authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel': for

'public men, are, as it were, public property,' and 'discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled.' " (citation omitted). In light of this treatment, *Beauharnais* does not support the sweeping prohibition of this Code section. *See also* T. Emerson, The System of Freedom of Expression 396 (1970); *Anti-Defamation League of B'nai B'rith v. FCC,* 131 U.S.App.D.C. 146, 403 F.2d 169, 174 n. 5 (Wright, J., concurring), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).

unprotected expression. These sections cast a substantial chill on the expression of protected speech and are unconstitutionally overbroad and vague on their face. *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).[16]

In *Gertz v. Robert Welch, Inc., supra,* the Supreme Court refused to extend the protection of the *Times* "actual malice" standard to the publisher of an allegedly defamatory statement against a private citizen. In so doing, the Court did not engage in "ad hoc" balancing of the "needs of the press and the individual's claim to compensation for wrongful injury." 418 U.S. at 343–44, 94 S.Ct. at 3009.[17] Instead, the Court laid down "broad rules of general application . . . [which] treat alike various cases involving differences as well as similarities." The Court concluded that the *New York Times* rule states an "accommodation between this concern [of the press and broadcast media in immunity from liability] and the limited state interest present in the context of libel actions brought by public persons." *Id.* *See also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L. Ed.2d 328 (1975) (Powell, J., concurring).

The type of "definitional balancing" applied in *Gertz* and *Times* recognizes that not all defamatory speech is protected by the first amendment. *See*

Nimmer, the Right to Speak from *Times* to *Time:* First Amendment Theory Applied to Libel and Misapplied to Privacy, 56 Calif.L.Rev. 935, 942–43 (1968). In essence, it is this type of "definitional balancing" which we have employed in Part II of this opinion when we concluded that the deliberate calculated falsehood does not enjoy constitutional protection even when made during the course of a political campaign and when it involves a proceeding by the Board rather than a civil defamation suit or criminal prosecution. Our conclusion then struck an "accommodation" between the legitimate interest of the state in protecting the electoral process and the "slight social value" associated with calculated falsehoods.

■ Facial overbreadth analysis involves a somewhat different approach than "definitional balancing." Overbreadth review is based on a determination of whether the language of the statute in question or the construction it has been given is susceptible of application to protected expression. *Gooding, supra,* 405 U.S. at 522, 92 S.Ct. 1103. *See generally,* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L. Rev. 844 (1970). In effect, it is a doctrine which recognizes that despite any legitimate state interest involved, the chilling effect on protected expression is too high a price to pay when the regulatory scheme has not been narrowly drawn. Such a doctrine "is, manifestly, strong medicine." *Broadrick v. Okla-*

16. Our analysis is primarily concerned with the "overbreadth" of the Code sections and the statute. Vagueness and overbreadth are closely related when first amendment expression is at issue. See Note, The First Amendment Overbreadth Doctrine, 83 Harv. L.Rev. 849, 871–75 (1970). *See generally* the discussion of the relation between overbreadth and vagueness in *Tollett v. United States,* 485 F.2d 1087, 1096 n. 22 (8th Cir. 1973).

17. Professor Emerson defines "ad hoc" balancing as follows: "The formula is that the court must, in each case, balance the individual and social interest in freedom of expression against the social interest sought by the

regulation which restricts expression." Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 912 (1963). The essence of the doctrine is "a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." *Barenblatt v. United States,* 360 U.S. 109, 126, 79 S.Ct. 1081, 1093, 3 L.Ed.2d 1115 (1959). *See also American Communications Assn. v. Douds,* 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); *Dennis v. United States,* 341 U.S. 494, 524–25, 542, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring); *Konigsberg v. State Bar,* 366 U.S. 36, 49–51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).

*homa,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■ When considering standing to raise an overbreadth challenge, there is "no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski v. Pfister,* 380 U. S. 479, 486, 85 S.Ct. 1116, 1121, 14 L. Ed.2d 22 (1965). Plaintiffs here have shown more than "allegations of a subjective chill." *Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Vanasco and Ferris have already been subject to adverse decisions by the Board and Postel's proceeding before the Board has been stayed pending this litigation. All three plaintiffs alleged that they will be candidates for office in future elections. We feel that plaintiffs have demonstrated claims of "specific present objective harm or a threat of specific future harm." *Laird v. Tatum, supra* at 13–14, 92 S.Ct. at 2326. *See also Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

Our approach is similar to that followed by the Court in analyzing the "breach of the peace statutes" involved in *Gooding* and *Lewis. See also Weigand v. Seaver,* 504 F.2d 303 (5th Cir. 1974), *cert. denied,* 421 U.S. 924, 95 S. Ct. 1650, 44 L.Ed.2d 83 (1975). In those decisions the Court found that the very language of the statutes and the construction given them by the state courts produced a broader sweep than the constitutional definition of "fighting words." The Code's misrepresentation sections, while not involving "breach of the peace statutes" or "fighting words," are similarly deficient. The Board

argues that the Code sections are narrowly drawn to regulate only unprotected calculated falsehoods. Although the challenged sections only mention "misrepresentation," § 472(a) of the Election Law describes "deliberate misrepresentations." Reading these two sections together, the Board contends that deliberate misrepresentation is the equivalent of *Times* "actual malice" and that any Board proceeding requires such a finding. We disagree with this argument. The sweeping nature of those sections is exemplified by their provisions. For example, "misrepresentation of any candidate's qualifications" (§ 6201.1(d)) includes among its prohibitions the use of "personal vilification" and "scurrilous attacks." [18] Like "attacks based on race, sex, religion or ethnic background" (§ 6201.1(c)) such expression may be offensive but by that fact alone it does not lose its constitutional protection. *Cohen v. California,* 403 U.S. 15, 22–23, 91 S.Ct. 1780, 29 L. Ed.2d 284 (1971). *See also Tollett v. United States,* 485 F.2d 1087, 1093 (8th Cir. 1973).

■ That these Code sections are susceptible to application to protected speech could not be more clearly demonstrated than by the construction given to them by the Board in the *Vanasco* and *Ferris* cases. While as to Ferris, the Board found that the campaign literature was utilized "with actual knowledge of its falsity or with reckless disregard of its falsity," as to Vanasco, the Board merely found that he had "misrepresented" his party endorsement. There was no finding that the misrepresentation was deliberate or that it was made with knowledge of its falsity or reckless disregard of the truth.[19] No limiting

---

18. The definition of these terms demonstrates that they encompass protected expression. Scurrilous means "using or given to using the language of low buffoonery." Websters Third New International Dictionary (Unabridged) 2044 (1966). To vilify can mean to make "less valuable or important," and "lower in estimation." *Id.* 2552. Even the word "misrepresentation" is broader than "falsehood" since it includes "un-

true, incorrect, or misleading" representations. *Id.* at 1445.

19. Although our analysis is based on the facial invalidity of the Code, the failure to find that Vanasco made any misrepresentation with "knowledge of its falsity or with reckless disregard of its truth," or even that it was "deliberate" clearly shows that the Code was unconstitutionally applied to Vanasco.

construction has been applied to these sections and we cannot do so. *Gooding, supra,* 405 U.S. at 520, 92 S.Ct. 1103; *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

It is not hard to see then, given the often difficult task of trying to define, for example, what a political candidate's "position" is on issues discussed during a campaign, that the term "misrepresentation" could be applied to almost all campaign speech. The candidate who wishes to avoid the consequences of a Code proceeding—including the adverse publicity such a proceeding would generate—might very well be "chilled" from the expression of protected First Amendment speech.

Although our approach to overbreadth analysis of the Code has followed what we believe to be the holding of such decisions as *Gooding* and *Lewis,* we also recognize that the overbreadth doctrine has been subject to increasing criticism. *See Gooding, supra,* 405 U.S. at 528–34, 92 S.Ct. 1103, (Burger, C. J., dissenting); *Lewis, supra,* 415 U.S. at 136–42, 94 S.Ct. 970 (Blackmun, J., dissenting).[20] These dissenting Justices have expressed concern with the "indiscriminate," "mechanical," and "insensitive" application of the doctrine by a majority of the Court. Despite this criticism, it is still conceded that the overbreadth doctrine performs a legitimate purpose when it "invalidates statutes because their language demonstrates their potential for *sweeping improper* applications posing a significant likelihood of deterring important First Amendment speech —not because of some insubstantial or imagined potential for occasional and isolated applications that go beyond constitutional bounds." *Gooding, supra,* 405 U.S. at 530–531, 92 S.Ct. at 1110 (Burger, C. J., dissenting) (emphasis added). Proper analysis then would involve consideration of "the nature of the speech in question, the possible effect

the statute or ordinance has upon such speech, the importance of the speech in relation to the exposition of ideas, or the purported or asserted community interest in preventing that speech." *Lewis, supra* 415 U.S. at 136–37, 94 S.Ct. at 974 (Blackmun, J., dissenting).

Strict overbreadth analysis does not involve any "interest balancing." *See, e. g., United States v. Robel,* 389 U.S. 258, 268 n. 20, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). *Gooding* and *Lewis* did not involve "interest balancing" as such for once it was determined that the statutes were susceptible to application to protected speech they were classified as overbroad. While we follow (as we must) those decisions, we also conclude that the challenged Code sections are fatally overbroad even when measured against the criteria outlined by the dissenting Justices in *Gooding* and *Lewis.*

Initially, we note that the inhibitory "chilling effect" resulting from the overbreadth of the Code, applies to important First Amendment speech. Free debate on public issues is essential to the survival of the Republic. It hardly needs repeating that such speech should be "uninhibited, robust and wide-open." The importance of such expression was outlined in *Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1437, 16 L. Ed.2d 484 (1965):

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

In our view, the Code creates a "substantial chill" and has a significant likelihood of deterring this important First

---

20. *See generally,* Note, Overbreadth Review and the Burger Court, 49 N.Y.U.L.Rev. 532 (1974).

Amendment speech.[21] We cannot agree with the Board's contentions that any chill on protected expression is "minor or purely speculative," and that the chill of unlimited liability for damages or imprisonment under the *Times* and *Garrison* decisions is "much more significant than any chill that might result from the Code's existence."

In addition to the overbroad language in the Code and its demonstrated application to protected speech as discussed above, other factors emphasize the substantial chilling effect of the Code. Prior to its effective date (September 30, 1974) the Code was published in newspapers throughout the State of New York and distributed to all candidates for the Legislature and other State and National offices. Based on this distribution, it would be logical to assume that most, if not all, candidates for office in 1974 were aware of at least the existence—and quite possibly the details—of the Code. Also significant is the realistic assumption that any adverse finding by the Board (and indeed, the filing of a charge by an opponent) will be highly publicized by the respondent's opponent (both Vanasco and Ferris allege in their complaint that they received extensive adverse publicity as a result of the Board's decisions).[22] Upon consideration of these factors it is not difficult to see how a political candidate might be deterred from making protected statements when he must consider the consequences of a Board proceeding.

The substantial chill resulting from the factors outlined above is manifestly demonstrated by a final and critical factor—the very nature of a Board proceeding. In our view, the result of the *Times* line of cases is the formulation of a rule—the requirement of "actual malice"—which is highly protective of speech. When applied in the defamation context it means that "many deserving

21. In two companion cases, *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) and *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S. Ct. 2908, 37 L.Ed.2d 830 (1973) overbreadth challenges to the federal Hatch Act, 5 U.S. C. § 7324 (1970), and the Oklahoma version of the Hatch Act were defeated. The Court's reasoning in upholding the Oklahoma statute in *Broadrick* was as follows: "[T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behaviour that it forbids the State to sanction moves from 'pure speech' towards conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (citation omitted). 413 U.S. at 615, 93 S.Ct. at 2917. In his dissenting opinion Justice Brennan criticized the majority for not defining "substantial overbreadth" and also notes that "a requirement of substantial overbreadth is already implicit in the doctrine." *Id.* at 630, 93 S.Ct. at 2925. As discussed in this opinion, we feel the challenged Code sections and the statute are substantially overbroad.

22. Vanasco alleges that he was "subjected to wide spread, unfavorable pre-election publicity, including newspaper articles concerning the proceedings before the Board and statements by Mr. Vanasco's opponent (who had initiated the complaint before the Board) in the press, in his newspaper column, and at community meetings, to the effect that such proceedings had proven Mr. Vanasco to be dishonorable . . . [M]any individuals in Mr. Vanasco's community expressed to him the belief that the Board's decision had proved him to be dishonest." Complaint ¶ 15. Ferris alleges that on the day of the election his opponent "widely publicized, through loudspeakers and leaflets, the Board of Election determination that Mr. Ferris had violated the Code and that he had knowingly distributed false literature." Complaint ¶ 27.

plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test." *Gertz v. Robert Welch, Inc., supra* 418 U.S. at 342, 94 S.Ct. at 3008. The high degree of protection afforded by the *Times* rule is underscored by the requirement that "knowing falsity" must be proven with "convincing clarity." *Times, supra* 376 U.S. at 285–86, 84 S.Ct. 710.[23]

A respondent in a proceeding before the Board receives no such protection. To begin with, the Code provides for an administrative as opposed to a judicial proceeding. Although authorized to file suit in the state courts for an injunction to enforce its decisions (N.Y. Election Law §§ 472(c), 469) the Board is also empowered to impose a fine up to $1,000 for each violation and may issue a report setting forth its findings and determinations (§§ 6201.3(i)(2)–(3)). No provision is made for a candidate who is either fined or the subject of a report to obtain judicial review of the Board's action.[24] Moreover, a finding of the Board need not be premised on what we view as a constitutional requirement of "clear and convincing" proof. On conclusion of a proceeding, the Code provides that a determination shall be "based on substantial evidence"[25] (§ 6201.3(i)(1)).

Judicial participation is particularly necessary when important First Amendment expression is involved. *Cf. Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). *See* Monaghan, First Amendment "Due Process," 83 Harv.L.Rev. 518, 519–24 (1970).[26] A respondent

---

**23.** In *Gertz,* the Court noted that the *Times* rule calls for "clear and convincing proof that the defamatory falsehood was made with knowledge of a falsity or with reckless disregard for the truth." 418 U.S. at 342, 94 S.Ct. at 3008. *See also* Justice Brennan's dissenting opinion, *id.* at 366–67, 94 S.Ct. 2997 (contrasting clear and convincing with preponderance of the evidence). "Recklessness" must be measured not on a reasonable man basis but on whether the defendant had serious doubts as to the truth of his statement. *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

**24.** It may be possible to obtain review by way of an article 78 proceeding (N.Y.C.P.L.R. § 7801 *et seq.* (McKinney 1963)). This is the statutory replacement for relief previously provided by writs of certiorari to review, mandamus and prohibition. In contrast to the specific provisions allowing the Board to obtain an injunction to enforce its orders (N.Y. Election Law §§ 472(c), 469) there is no specific provision in the statute or Code allowing a respondent to obtain judicial review of the Board's order.

**25.** The use of the term "substantial evidence" usually refers to the scope of judicial review of an administrative proceeding. *See, e. g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.Y.C.P.L.R. § 7803(4) (McKinney 1963). While the scope of review may be defined in terms of substantial evidence, the burden of

proof may still be construed as "clear and convincing." *See, e. g., Woodby v. Immigration Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) ("clear, unequivocal and convincing" burden in a deportation proceeding). The Code is silent as to any burden of proof standard except for the reference to "substantial evidence" as a requirement for the Board's finding. It can be implied then that the preponderance of the evidence standard is applicable. *See* Jaffee, Administrative Law: Burden of Proof and Scope of Review, 79 Harv.L.Rev. 914, 915 (1966).

**26.** The need for judicial review as a procedural safeguard is usually associated with the doctrine of prior restraint, *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), an argument raised by plaintiffs but one which we do not reach. *See* note 27, *infra.* The necessity for judicial review of first amendment claims was summarized by Professor Monaghan as follows: "*Freedman's* preference for judicial evaluation of first amendment claims rests upon the most fundamental considerations— the inherent institutional differences between courts and administrative agencies, no matter how judicial the administrative proceedings may be. First, long judicial tenure frees judges, in most cases, from direct political pressures. Judicial insulation encourages impartial decision making; more importantly, it permits the courts to take the 'long view' of issues. Administrative bodies, particularly at a state level, are rarely so

in a Code proceeding faces the possibility of final action—which action could be taken within a few days of an election—based on findings made not in a judicial proceeding, but rather in an administrative proceeding by a Board whose members are recommended by the legislative leaders and state chairmen of the two major political parties (Election Law § 468(a)) and where proof may be less than clear and convincing. We feel that, taken together, all the factors we have discussed demonstrate that the Code creates a substantial chill on the expression of important First Amendment expression.

Nothing in our decision downgrades the state's legitimate interest in insuring fair and honest elections. Undoubtedly, deliberate calculated falsehoods when used by political candidates can lead to public cynicism and apathy toward the electoral process. However, when the State through the guise of protecting the citizen's right to a fair and honest election tampers with what it will permit the citizen to see and hear even that important state interest must give way to the irresistible force of protected expression under the First Amendment.

We conclude that sections 6201.1(c), (d), (e), (f) of the New York Fair Campaign Code and section 472(a) of the New York Election Law are unconstitutional on their face. We do not reach the other arguments raised by plaintiffs.[27]

Summary judgment granted for all plantiffs, denied for all defendants.

So ordered.

APPENDIX

Section 472 of the New York Election Law (McKinney Supp.1974) provides:

§ 472. Fair campaign code

a. In addition to the powers and duties elsewhere enumerated in this article, the state board of elections, after public hearings, shall adopt a "fair campaign code" setting forth ethical standards of conduct for persons, political parties and committees engaged in election campaigns including, but not limited to, specific prohibitions against practices of political espionage and other political practices involving subversion of the political parties and process, attacks based on racial, religious or ethnic background and deliberate misrepresentation of a candidate's qualifications, position on a political issue, party affiliation or party endorsement.

b. Such code shall be published at least twice during the three months preceding a general election in one newspaper of general circulation in each county and, in the city of New York, in two newspapers of general circulation in the city of New York. Copies of such code shall also be sent to each candidate, political party, political committee and boards of election upon request.

c. The state board of elections, on its own initiative, or upon complaint or otherwise, may investigate any alleged violation of the fair campaign code and, in appropriate cases, may apply for an order, as provided in section four hundred sixty-nine of this article.

---

insulated; indeed, they are often seen primarily as political organs." 83 Harv.L.Rev. at 522.

27. Aside from arguing that the Board proceedings were unconstitutionally applied, plaintiffs also argue that the statute and Code impermissibly authorize prior restraints on speech. *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584

(1963); *Wilson v. Superior Court of Los Angeles County*, 13 Cal.3d 652, 119 Cal. Rptr. 468, 532 P.2d 116 (1975) (injunction against the publication of allegedly misleading and libelous statements made by a candidate for political office about his opponent found to be an unconstitutional prior restraint). Since we hold the statute and the Code unconstitutional on other grounds we do not consider whether the Board proceedings constitute an unconstitutional system of prior restraints.

d. In addition to any other civil or criminal penalty which may be provided for by law, the state board may impose a civil penalty, not to exceed one thousand dollars, upon any person found by the board, after a hearing, to have violated any of the provision [1] of such code.

Any such finding by the board may only be had after a hearing conducted by it upon reasonable written notice, as the board may determine, to such person and affording such person a reasonable opportunity to be heard and present and examine witnesses thereat. Added L.1974, c. 604, § 1.

The New York Fair Campaign Code, 9 New York Codes, Rules and Regulations (1974) reads as follows:

Section 6201.1 Fair Campaign Code. In order that all political campaigns be conducted under a climate promoting discussion of the issues and presentation of the records and policies of the various candidates, stimulating just debate with respect to the views and qualifications of the candidates and without inhibiting or interfering with the right of every qualified person and political party to full and equal participation in the electoral process, the following is hereby adopted by the New York State Board of Elections pursuant to section four hundred seventy-two of the election law as the Fair Campaign Code for the State of New York.

No person, political party or committee during the course of any campaign for nomination or election to public office or party position shall, directly or indirectly, whether by means of payment of money or any other consideration, or by means of campaign literature, media advertisements or broadcasts, public speeches, press releases, writings or otherwise, engage in or commit any of the following:

(a) Practices of political espionage including, but not limited to, the theft of campaign materials or assets, placing one's own employee or agent in the campaign organization of another candidate, bribery of members of another's campaign staff, electronic or other methods of eavesdropping or wiretapping.

(b) Political practices involving subversion or undermining of political parties or the electoral process including, but not limited to, the preparation or distribution of any fraudulent, forged or falsely identified writing or the use of any employees or agents who falsely represent themselves as supporters of a candidate, political party or committee.

(c) Attacks on a candidate based on race, sex, religion or ethnic background.

(d) Misrepresentation of any candidate's qualifications including, but not limited to, the use of personal vilification, character defamation, whispering campaigns, libel, slander, or scurrilous attacks on any candidate or his staff or his personal or family life, use of the title of an office not presently held by a candidate, use of the phrase "re-elect" when, in fact, the candidate has never been elected to the office for which he is a candidate.

(e) Misrepresentation of any candidate's position including, but not limited to, misrepresentation as to political issuses or his voting record, use of false or misleading quotations, attributing a particular position to a candidate solely by virtue of such candidate's membership in any organization other than his political party which might have issued a statement advocating or opposing any particular position.

(f) Misrepresentation of any candidate's party affiliation or party endorsement or endorsement by persons or organizations including, but not limited to, use of doctored photographs or writings or fraudulent or untrue endorsements. In any case where a person or organization endorsing the candidate has been

---

1. So in original. Probably should read "provisions".

paid by the candidate or someone on his behalf, a statement signed by the candidate and stating the consideration for the endorsement shall be filed within twenty four hours of the endorsement in the office in which the candidate is required to file his statements under section four hundred seventy-seven of the election law.

(g) Misrepresentation of the contents or results of a poll relating to any candidate's election; also, failure to disclose such information relating to a poll published or otherwise publicly disclosed by a candidate, political party or committee as required to be disclosed by rule or regulation of the New York State Board of Elections.

(h) Any acts intended to hinder or prevent any eligible person from registering to vote, enrolling to vote or voting.

Section 6201.2 Use of Public Opinion Polls. No candidate, political party or committee during the course of any campaign for nomination or election to public office or party position shall, directly or indirectly, disclose or cause to be disclosed, the results of a poll relating to a candidate for such an office or position, unless within 48 hours after such disclosure, they provide the State Board of Elections with the following information concerning the poll:

(a) The name of the person, party, or organization that contracted for or who commissioned the poll and/or paid for it.

(b) The name and address of the organization that conducted the poll.

(c) The numerical size of the total poll sample, the geographic area covered by the poll and any special characteristics of the population included in the poll sample.

(d) The exact wording of the questions asked in the poll and the sequence of such questions.

(e) The method of polling whether by personal interview, telephone, mail, or other.

(f) The time period during which the poll was conducted.

(g) The number of persons in the poll sample; the number contacted who responded to each specific poll question; the number of persons contacted who did not so respond.

(h) The results of the poll.

Section 6201.3 Procedure in Fair Campaign Code Proceedings. (a) Initiation of Proceeding. (1) A proceeding under the Fair Campaign Code (hereinafter "Code") shall be commenced by the New York State Board of Elections when:

A. The Board receives a written complaint sworn to or affirmed, alleging the commission or omission of acts, in violation of the Code or

B. The Board, on its own initiative, undertakes an investigation of an alleged violation of the Code.

(2) A complaint shall be filed by mailing to, or by personally serving, the Board of Elections at 194 Washington Avenue, Albany, New York 12225.

(b) Form of Complaint. (1) A complaint shall, if possible, be based on personal knowledge and belief and be specific as to times, places and names of witnesses to the acts charged as violations of the Code. If a complaint is based upon information and belief, the complainant shall state the source of his information and belief. Copies of all documentary evidence available to the complainant shall be attached to the complaint.

(2) If a complaint is submitted by a person acting on behalf of a candidate, authorized or unauthorized political committee, party committee, or constituted committee, as those terms are defined in Section 467 of the Election Law, it shall so state. In any case of a complaint submitted by a person acting on behalf

of a candidate, the candidate shall attach to the complaint a signed statement that he has read the complaint and has authorized it to be filed with the Board.

(c) Answer. (1) If after receipt and preliminary review of a complaint alleging a violation of the Code, or following commencement of an investigation initiated by the Board, where the Board determines a hearing shall be held, then the Board shall send notice, by certified mail, to any person, organization or committee (hereinafter "respondent") whose conduct is complained of or whose conduct is under investigation. Such notice shall specify when and where a hearing is to be held (such a hearing may not be held earlier than seven days from service of the notice of hearing, or on such earlier date, as the Board may for good cause require) and include a brief statement of the alleged Code violation, and where applicable, a copy of the complaint. If, following preliminary review, the Board determines that a complaint does not warrant further action, it shall promptly notify the complainant and provide him with the reasons for its determination.

(2) A respondent may file an answer, sworn to or affirmed (within seven days or such shorter period as the Board may for good cause require) after service upon him of the notice of hearing. Such an answer shall, if possible, be based on personal knowledge and belief and be specific as to times, places, and names of witnesses to acts relevant to the complaint. Copies of all documentary evidence available to the respondent shall be annexed to the answer. If an answer is based on information and belief, the respondent shall state the source or sources of his information and belief. An answer shall be filed by certified mail or by personally serving the Board at 194 Washington Avenue, Albany, New York 12225.

(d) Hearing. (1) A respondent shall appear for a hearing at the time and place fixed in the notice of hearing.

(2) In any proceeding, the Board may designate a hearing officer before whom sworn evidence may be taken.

(3) In any proceeding, either the Board or any hearing officer designated by it shall have all the powers necessary for the taking of evidence including, but not limited to, the power:

A. To fix the time or times when, and the place or places where, the evidence shall be taken;

B. To regulate the course of the hearing and the conduct of the parties and their counsel;

C. To administer oaths and affirmations;

D. To provide for the taking of testimony by deposition; and

E. To consider and rule upon all objections to evidence and motions regarding the same and to receive any offers of proof.

F. The Board may issue subpoenas requiring the attendance of witnesses and/or the production of any materials at any hearing.

(e) Hearing Procedure. (1) In any hearing, parties shall have the right to representation by counsel, cross examination, presentation of evidence, objection and motion. Irrelevant or unduly repetitious evidence, however, may be excluded, and the rules of evidence need not apply, although the rules of privilege recognized by law shall be given effect.

(2) All hearings conducted by the Board or any hearing officer shall be in private, but the record of any such hearing may be publicly disclosed upon a majority vote of the Board. Any report or finding by the Board, however, shall be made public promptly after its issuance or determination.

(3) Disposition of any proceeding may be made by agreement of the parties involved with the Board's approval.

(f) Public Comment. During the pendency of any proceeding, no member of the Board or its staff shall comment publicly on the subject matter of the

proceeding other than to acknowledge that a complaint has been received or an inquiry is under way.

(g) Transcripts. A complete record shall be made for all testimony taken before the Board or a hearing officer. For this purpose, stenographic transcriptions or electronic recording devices may be used. A respondent may purchase a copy of the transcript or any part thereof. In addition, a witness shall be entitled to purchase a copy of that portion of the record containing his testimony.

(h) Hearing Officer's Report. (1) If a hearing is conducted by a hearing officer, he shall, after considering the evidence and matters officially noted, make and file a report with the Board. Such report shall contain:

A. Findings of fact; and

B. Conclusions of law.

(2) Together with his report, the hearing officer shall file with the Board the entire record of the proceedings before him, including the transcript and any exhibits.

(i) Findings, Fines and Reports. (1) Upon the conclusion of any hearing, or upon receipt of a hearing officer's report, the Board shall make a determination, based upon substantial evidence, whether the respondent has violated any provision of the Code.

(2) The Board may impose a fine up to and including $1,000 upon each respondent for each and every separate violation of the Code.

(3) In addition to, or in lieu of any fine, the Board may issue a report setting forth its findings and determinations.

(j) Counsel. (1) The Board may retain counsel to advise and assist it, or a hearing officer, in the conduct of any proceeding and the preparation of any documents. The name of any such counsel shall be placed upon the record at the outset of the hearings.

(2) The appearance of any party by attorney shall be noted by filing with the Board a statement signed by the party setting forth the name and address of the attorney.

(3) All papers to be served upon a party may be served personally or by certified mail on his attorney of record.

(k) Construction. This Section shall be liberally construed and shall not be deemed to limit the powers conferred on the New York State Board of Elections by statute.