In the MATTER OF JUDICIAL DISCIPLINARY PROCEEDINGS AGAINST the Honorable Michael J. GABLEMAN

WISCONSIN JUDICIAL COMMISSION,
Complainant,

v.

The Honorable Michael J. GABLEMAN,
Respondent.

Supreme Court

*No. 2008AP2458–J. Oral argument April 16, 2010.*
*—Decided June 30, 2010.*

2010 WI 61

(Also reported in 784 N.W.2d 605.)

For the complainant there were briefs and oral argument by *James C. Alexander and the Judicial Commission*, Madison.

For the respondent there was a brief by *Eric M. McLeod and Michael Best & Friedrich LLP*, Madison, and *James Bopp, Jr., Anita Y. Woudenberg, and Bopp, Coleson & Bostrom,* Terre Haute, Ind. and oral argument by *Eric M. McLeod.*

SHIRLEY S. ABRAHAMSON, C.J., ANN WALSH BRADLEY, J., and N. PATRICK CROOKS, J.

¶ 1. Under normal circumstances the court would be issuing a per curiam opinion (an opinion BY THE COURT), setting forth the separate writings of the

members of the court. *See* our proposed per curiam attached as Attachment A. *See also, State v. Allen,* 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863 (Feb. 11, 2010). Unfortunately, Justices David Prosser, Patience Roggensack, and Annette Ziegler are unwilling even to join us in the proposed per curiam attached.

¶ 2. Surprisingly, Justices Prosser, Roggensack, and Ziegler do not wish their separate writing to have the same public domain citation as our writing – a complete break from our usual practice. Our writing will have a public domain citation of 2010 WI 61. The separate writing of Justices Prosser, Roggensack, and Ziegler will have a public domain citation of 2010 WI 62.

## ATTACHMENT A

PER CURIAM. Separate writings attached.

¶ 3. SHIRLEY S. ABRAHAMSON, C.J.; ANN WALSH BRADLEY, J.; and N. PATRICK CROOKS, J., deliver the following opinion.

¶ 4. For ease of reference, here is a road map to this opinion.

### I. Justice Gableman's Motion for Summary Judgment Fails to Capture 4 Votes. (*See* ¶¶ 3–19)

We three, Chief Justice Shirley Abrahamson, Justice Ann Walsh Bradley, and Justice N. Patrick Crooks, conclude:

- Justice Gableman's advertisement violated the first sentence of SCR 60.06(3)(c).

- The advertisement "misrepresent[ed] ... [a] fact concerning ... an opponent" and was made knowingly or with reckless disregard for truth or falsity.

- The First Amendment does not protect knowingly false statements.

Justice David T. Prosser, Justice Patience D. Roggensack, and Justice Annette K. Ziegler[1] conclude otherwise and anticipate a further motion from the Judicial Commission.

Because of a deadlock, we three conclude that a remand to the Judicial Commission for a jury hearing is required.

## II. The Advertisement Violates the First Sentence of SCR 60.06(3)(c). (*See* ¶¶ 20–63)

## III. The First Amendment Does Not Protect Knowingly Made False Statements. (*See* ¶ 64–113).

### I

¶ 5. The Wisconsin Judicial Commission (Judicial Commission) filed a complaint against Justice Michael J. Gableman based on a TV advertisement run by his campaign.

¶ 6. The Wisconsin Judicial Commission contends that Justice Gableman's advertisement violated the first sentence of SCR 60.06(3)(c) because the advertisement "misrepresent[ed] . . . [a] fact concerning . . . an opponent."

¶ 7. A Judicial Conduct Panel (Panel) was designated to hear this matter under Wis. Stat. § 757.87(3). The parties filed proposed statements of facts,[2] and the

---

[1] *See* 2010 WI 62 for the separate writing of Justices Prosser, Roggensack, and Ziegler.

[2] Following a procedure jointly proposed by the parties, the Judicial Commission filed a Statement of Facts, Justice Gable-

Judicial Commission then moved the panel to compel further response from Justice Gableman. The Panel denied this motion, stating that "[g]iven the existence of factual disputes, an evidentiary hearing is the next step in the process." Justice Gableman then moved the Panel for summary judgment.

¶ 8. The Panel received briefs and heard oral argument on Justice Gableman's motion for summary judgment. In its determination of the motion for summary judgment, the Panel made findings of fact and conclusions of law. The Panel recommended that Justice Gableman's motion for summary judgment be granted[3] and that the Judicial Commission's complaint be dismissed.[4] The matter comes before the court on review of the Panel's recommendation to grant summary judgment.[5] The Panel entered its recommendation recognizing that the Supreme Court "retains the ultimate authority to grant or deny the motion." Judicial Conduct

man filed a Statement of Facts and Response to the Commission's statement, and the Judicial Commission filed a Response to Justice Gableman's Statement.

[3] Judicial Conduct Panel, slip op. at 4, n.4 ("The judicial conduct panel, of course, cannot grant or deny summary judgment. Rather, this panel may make its recommendation as to whether the motion for summary judgment should be granted to the supreme court, which retains the ultimate authority to grant or deny the motion.")

[4] Judicial Conduct Panel, slip op. at 15 ("[W]e recommend that Justice Gableman's motion for summary judgment be granted and the Commission's complaint be dismissed.").

[5] Justice Gableman moved this court for review of the panel's recommendation that summary judgment be granted pursuant to Wis. Stat. § 757.91. The Judicial Commission agreed that the factual record was complete and could form the basis for this court's review. This court ordered briefing and scheduled oral argument.

Panel, slip op. at 4 n.4. The court is equally divided with respect to the Panel's recommendation.

¶ 9. Summary judgment is available to a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).[6] In *Grams v. Boss*, this court set forth the method for evaluating such a motion:

> If the complaint states a claim and the pleadings show the existence of factual issues, the court examines the moving party's (in this case the defendants') affidavits or other proof to determine whether the moving party has made a prima facie case for summary judgment under sec. 802.08(2). To make a prima facie case for summary judgment, a moving defendant must show a defense which would defeat the plaintiff. If the moving party has made a prima facie case for summary judgment, the court must examine the affidavits and other proof of the opposing party (plaintiffs in this case) to determine whether there exists disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial.
>
> ....
>
> The papers filed by the moving party are carefully scrutinized. The inferences to be drawn from the underlying facts contained in the moving party's material should be viewed in the light most favorable to the party opposing the motion. ... If the material presented on the motion is subject to conflicting interpre-

---

[6] All references to the Wisconsin Statutes are to the 2007–08 version.

tations or reasonable people might differ as to its significance, it would be improper to grant summary judgment.

*Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). In *Green Springs Farms v. Kersten*, we clarified that the approach taken by an appellate court to a summary judgment motion is identical to that taken by a trial court:

There is a standard methodology which a trial court follows when faced with a motion for summary judgment. The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated.

If a claim for relief has been stated, the inquiry then shifts to whether any factual issues exist.

. . . .

When this court is called upon to review the grant of a summary judgment motion, as we are here, we are governed by the standard articulated in section 802.08(2), and we are thus required to apply the standards set forth in the statute just as the trial court applied those standards.

*Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987) (citations omitted).

¶ 10. The court is equally divided on the recommendation of the Panel that Justice Gableman's motion for summary judgment be granted and the Commission's complaint dismissed. Three justices would reject the recommendation of the Panel and three would accept it. We three justices, Chief Justice Abrahamson, Justice Bradley, and Justice Crooks, would deny Justice Gableman's motion for summary judgment on the

grounds that he has failed to establish a prima facie case for summary judgment.

¶ 11. Justice Prosser, Justice Roggensack, and Justice Ziegler would accept the Panel's recommendation to grant Justice Gableman's motion for summary judgment and dismiss the complaint, on the grounds that the Judicial Commission has failed to establish a prima facie case for summary judgment and has failed to meet, to a reasonable certainty by evidence that is clear and convincing, its burden of proof with regard to Justice Gableman's alleged violation of the Judicial Code.

¶ 12. The court is equally divided on the question of whether the advertisement constituted a violation of SCR 60.06(3)(c) for which discipline may be imposed.

¶ 13. We three, Chief Justice Abrahamson, Justice Bradley, and Justice Crooks, would reject and three justices, Justice Prosser, Justice Roggensack, and Justice Ziegler, would accept the Panel's recommended conclusion that there was no violation of the first sentence of SCR 60.06(3)(c).[7]

¶ 14. We three justices, Chief Justice Abrahamson, Justice Bradley, and Justice Crooks, conclude that the advertisement misrepresented a fact about Justice Gableman's opponent and that this misrepresentation was made knowingly or with reckless disregard for the

---

[7] SCR 60.06(3)(c) provides:

Misrepresentations. A candidate for a judicial office shall not knowingly or with reckless disregard for the statement's truth or falsity misrepresent the identity, qualifications, present position, or other fact concerning the candidate or an opponent. A candidate for judicial office should not knowingly make representations that, although true, are misleading, or knowingly make statements that are likely to confuse the public with respect to the proper role of judges and lawyers in the American adversary system.

truth or falsity of the statement, and thereby violates the first sentence of SCR 60.06(3)(c). Specifically, the advertisement knowingly (or with reckless disregard of the truth or falsity of the statements) communicated the falsehood that Louis Butler's conduct as Mitchell's defense attorney in finding a "loophole" facilitated Mitchell's release and later offense. The advertisement can reasonably be viewed only as communicating that Louis Butler's actions in representing Mitchell and finding a "loophole" led to Mitchell's release and his commission of another crime.[8]

¶ 15. Further, we conclude that imposing discipline under SCR 60.06(3)(c) would not violate the First Amendment to the United States Constitution in the present case. Since we three justices who find that a violation occurred do not constitute a majority, we do not reach the question of the appropriate sanction.

¶ 16. The question of whether the advertisement constituted a misrepresentation remains unresolved at this point. This case reaches us in summary judgment posture. Given that no majority of justices agrees to accept the Panel's recommendation that summary judgment be granted, the Judicial Commission's complaint has survived summary judgment.

¶ 17. It is contrary to every precedent and principle of civil procedure to suggest, as Justice Prosser, Justice Roggensack, and Justice Ziegler do, that the Judicial Commission, which was successful in defeating a motion for summary judgment in this court, should then

---

[8] We conclude that by approving the advertisement, Justice Gableman was in willful violation of the mandatory prohibition against misrepresentations contained in the first sentence of SCR 60.06(3)(c) and therefore engaged in judicial misconduct as defined by Wis. Stat. § 757.81(4)(a).

be coercively "invited" to bring a motion to dismiss the case that it has not actually lost. Rather, the standard procedure is that a case surviving summary judgment typically proceeds to trial. It is therefore appropriate at this juncture to remand this cause to the Judicial Commission for further proceedings[9] under Wis. Stat. § 757.87.[10]

¶ 18. Though the recommendation of the Panel has failed. Where the summary judgment has failed and the statutes do not provide an answer for proceeding other than by jury trial, Wis. Stat. § 757.87(1),(2), it remains necessary to resolve the matter in accordance with the governing statute to the extent possible. When this court cannot reach a decision because of a deadlock, it is incumbent on this court to ensure that a tribunal decide this matter.

¶ 19. Upon remand, therefore, the Commission should treat the complaint as if it were just being filed. Because the Panel route has not been successful in resolving the matter, the Commission needs to request

---

[9] *See, e.g., Racine County v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶ 5, 781 N.W.2d 88 (remanding for further proceedings after finding that plaintiff had survived summary judgment).

[10] Wisconsin Stat. § 757.87 provides:

Request for jury; panel. (1) After the commission has found probable cause that a judge . . . has engaged in misconduct . . . , the commission may . . . request a jury hearing.

(2) If a jury is requested under sub. (1), the hearing under s. 757.89 shall be before a jury selected under s. 805.08. A jury shall consist of 6 persons, unless the commission specifies a greater number, not to exceed 12. Five-sixths of the jurors must agree on all questions which must be answered to arrive at a verdict. A court of appeals judge shall be selected by the chief judge of the court of appeals to preside at the hearing, on the basis of experience as a trial judge and length of service on the court of appeals.

a jury hearing, with a jury of 12 persons, on the question of whether the campaign ad violated the Judicial Code. As noted above, the parties have submitted statements of facts, but on the record presented, Justice Gableman's motion for summary judgment has not succeeded. There are facts bearing on this case that were not included in the Panel's findings. For example, at oral argument Justice Gableman's counsel urged the court to consider the relevance of case citations that were visually included in the disputed advertisement. The Panel offered no findings or discussion regarding the case citations or the visual aspect of the advertisement. We discuss the citation information at ¶¶ 50–54. Contrary to Justice Gableman's counsel, we conclude that a jury could find that this citation information misrepresented relevant facts, thus corroborating, rather than disproving, the Judicial Commission's allegation that the advertisement violated SCR 60.03(3)(c).

¶ 20. On remand, the jury must hear testimony and arguments and view the advertisement at issue. The question for the jury is whether the facts as found by the jury constitute a violation of SCR 60.06(3)(c). The question of the First Amendment's relevance, if any, to SCR 60.06(3)(c), in contrast, is a question of law to be answered, if necessary, by the judge. The statutes set forth the procedures following a jury request: "A court of appeals judge shall be selected by the chief judge of the court of appeals to preside at the hearing,[11] on the basis of experience as a trial judge and length of service

[11] In order to avoid any question under Wis. Stat. § 757.19(2)(e) and SCR 60.04(b) of a judge's eligibility to preside at the hearing, the judge appointed should not be one of the three judges who "previously handled the action or proceeding" when the matter was before the Panel.

on the court of appeals." Wis. Stat. § 757.87(2). "The allegations of the complaint or petition must be proven to a reasonable certainty by evidence that is clear, satisfactory and convincing. The hearing shall be held in the county where the [respondent justice] resides unless the presiding judge changes venue for cause shown or unless the parties otherwise agree. . . . [T]he presiding judge shall instruct the jury regarding the law applicable to judicial misconduct or permanent disability, as appropriate." Wis. Stat. § 757.89. The presiding judge shall then "file the jury verdict and his or her recommendations regarding appropriate discipline for misconduct . . . with the supreme court." *Id.*

¶ 21. It is clear that the court is equally divided regarding the disposition of the matter. No four justices have voted either to accept or to reject the Judicial Conduct Panel's recommendations, nor have four justices agreed on Justice Gableman's motion for summary judgment or any disposition of the Judicial Commission's complaint. No action can therefore be taken on the Panel's recommendation. The Judicial Commission has failed to obtain a majority of justices to reject the recommendation of the Panel. Under these circumstances, the Panel is relieved of any further responsibility in this matter, and we remand the matter to the Judicial Commission with directions to request a jury hearing, in accord with Wis. Stat. §§ 757.87, 757.89, and 805.08.

II

¶ 22. The full narration of the advertisement at issue was as follows:

Unbelievable. Shadowy special interests supporting Louis Butler are attacking Judge Michael Gableman. It's not true!

589

Judge, District Attorney, Michael Gableman has committed his life to locking up criminals to keep families safe—putting child molesters behind bars for over 100 years.

Louis Butler worked to put criminals on the street.

Like Reuben Lee Mitchell, who raped an 11–year-old girl with learning disabilities. Butler found a loophole. Mitchell went on to molest another child.

Can Wisconsin families feel safe with Louis Butler on the Supreme Court?

¶ 23. First we examine whether the advertisement at issue violates the first sentence of SCR 60.06(3)(c). The first sentence of SCR 60.06(3)(c) states: "A candidate for a judicial office shall not knowingly or with reckless disregard for the statement's truth or falsity misrepresent the identity, qualifications, present position, or other fact concerning the candidate or an opponent."

¶ 24. SCR 60.06(3)(c) applied to then-circuit court Judge Gableman as a candidate in the 2008 campaign for judicial office, namely to be a Justice of the Wisconsin Supreme Court.[12]

¶ 25. Justice Gableman's advertisement related to his opponent, Louis Butler. The narration of the TV advertisement, set out in full above at ¶ 20, stated in relevant part:

Louis Butler worked to put criminals on the street.

Like Reuben Lee Mitchell, who raped an 11–year-old girl with learning disabilities. Butler found a loophole. Mitchell went on to molest another child.

Can Wisconsin families feel safe with Louis Butler on the Supreme Court?

---

[12] Judicial Conduct Panel Finding of Fact #2; SCR 60.01(2).

¶ 26. The narration does not include the visual aspects of the advertisement. Viewing the advertisement is, of course, the best way to evaluate the advertisement to determine whether it presents a violation of SCR 60.06(3)(c). For instance, the advertisement visually includes case citation information which the narration does not reflect. We discuss the import of the citation information at ¶¶ 50–54. The reader can access a video copy of the advertisement, which was Exhibit A attached to the Commission's complaint, at http://sc-media.wicourts.gov/sc-media/Gableman_Ad_Titled_Prosecutor.wmv.

¶ 27. We next explore what Justice Gableman knew when he ran the advertisement. Knowledge is important because SCR 60.06(3)(c) bars a candidate for judicial office from "knowingly or with reckless disregard for the statement's truth or falsity misrepresent[ing] . . . [a] fact concerning . . . an opponent." SCR 60.03(9) defines "knowingly" or "knowledge" as "actual knowledge of the fact in question, which may be inferred from the circumstances."

¶ 28. Here are the facts relating to Justice Gableman's knowledge. "The advertisement refers to Butler's representation of Mitchell."[13] Justice Gableman "became familiar with the decisions of the court of appeals and supreme court in Reuben Lee Mitchell's appeal, *State v. Mitchell*, 139 Wis. 2d 856, 407 N.W.2d 566 (Ct. App. 1987) (unpublished slip op.), *reversed*, *State v. Mitchell*, 144 Wis. 2d 596, 424 N.W.2d 698 (1988) . . . ."[14]

---

[13] Judicial Conduct Panel Finding of Fact #10.

[14] Judicial Conduct Panel Finding of Fact #6. Justice Gableman's answer #13: "In response to [the allegation in the complaint that "prior to publication of the Advertisement,

591

¶ 29. Justice Gableman made "every reasonable effort to ensure that the Ad was accurate" by "being familiar with the Mitchell cases in general, with their facts and holdings, and the arguments advanced by Butler, who represented Mitchell."[15] "Justice Gableman personally reviewed both the audio and video of the advertisement before its release."[16] "Justice Gableman viewed the Ad and reviewed the Ad's script prior to approving it for publication."[17] Justice Gableman "delayed the release of the advertisement while he sought to verify the accuracy of its contents."[18] Justice Gableman "approved the advertisement as it had been originally presented to him."[19]

¶ 30. Justice Gableman approved and ran the advertisement after knowing key facts about his opponent's role as a public defender representing Reuben Lee Mitchell.

¶ 31. The advertisement refers to Butler's representation as an appellate state public defender of Mitchell from 1985 to 1988 in Mitchell's appeal from a conviction of first-degree sexual assault of a child.[20] The reference in the advertisement to the "loophole" Butler found was

Judge Gableman was familiar with the facts and holdings of both the Supreme Court and the Court of Appeals decisions"], Justice Gableman affirmatively alleges that he had a general understanding of the decisions . . . ."

[15] Justice Gableman's Responsive Statement of Facts, #13(b).

[16] Judicial Conduct Panel Finding of Fact #5.

[17] Justice Gableman's Responsive Statement of Facts, #12.

[18] Judicial Conduct Panel Finding of Fact #5.

[19] Judicial Conduct Panel Finding of Fact #7.

[20] Judicial Conduct Panel Finding of Fact #10.

to his successful argument that "the rape-shield law . . . had been violated."[21]

¶ 32. Justice Gableman knew that the Supreme Court agreed with Butler's "loophole" argument that the cirsive zone of authority vested in another branch." Martinez v. DILHR, 165 Wis. 2d 687, 697, 478 N.W.2d 582 (1992). cuit court had erroneously admitted evidence against Mitchell in violation of the rape-shield law.[22] Justice Gableman knew that the Wisconsin supreme court declared the circuit court's evidentiary error harmless.[23]

¶ 33. Justice Gableman knew that Mitchell remained in prison until Mitchell was released according to the terms of his sentence on conviction of the charge on which Louis Butler represented him. Justice Gableman knew that after Mitchell's release from prison on parole, Mitchell committed a new offense.[24]

¶ 34. On this record, only one conclusion can be reached: Justice Gableman had knowledge of Butler's representation of Mitchell to which the advertisement referred and had knowledge that Louis Butler's representation of Mitchell in finding a "loophole" did not lead to the release of Mitchell.

¶ 35. The Judicial Conduct Panel found that "[n]othing that Justice Butler did in the course of his representation of Mitchell caused, facilitated, or en-

[21] Judicial Conduct Panel Finding of Fact #20. *See also* Justice Gableman's Responsive Statement of Facts, #7.

[22] Justice Gableman's Answer #10 admits this is a correct summary of the decisions. The Judicial Conduct Panel Finding of Fact #6 is that "Justice Gableman became familiar with the decisions of the court of appeals and supreme court in Reuben Lee Mitchell's" cases before these courts.

[23] Justice Gableman's Answer #10.

[24] Justice Gableman's Answer #10 admits these facts.

abled Mitchell's release from prison in 1992."[25] The Panel further found that "[n]othing that Justice Butler did in the course of his representation of Mitchell had any connection to Mitchell's commission of a second sexual assault of a child."[26]

¶ 36. Having established what Justice Gableman knew about his opponent's representation of Mitchell in the supreme court, we now determine whether the following sentences in the TV advertisement violated SCR 60.06(3)(c) by "misrepresent[ing] . . . [a] fact concerning the candidate or an opponent." The key sentences are:

> Louis Butler worked to put criminals on the street. Like Reuben Lee Mitchell, who raped an 11–year old girl with learning disabilities. Butler found a loophole. Mitchell went on to molest another child.

¶ 37. The Judicial Conduct Panel made findings of fact that each of the four sentences in the advertisement relating to Louis Butler was factually true.[27]

¶ 38. Two judges of the Judicial Conduct Panel concluded that four true statements cannot fit within the prohibition of the first sentence of SCR 60.06(3)(c). They reached the wrong decision for two reasons.

¶ 39. First, these two judges misread the text of the first sentence. They assert that the first sentence applies only to statements that are false and cannot apply to a true statement. They reach this conclusion, writing that "[t]he first sentence of SCR 60.06(3)(c) speaks to the 'truth or falsity' of any statement that 'misrepresent[s] the identify [sic], qualifications,

---

[25] Judicial Conduct Panel Finding of Fact #16.
[26] Judicial Conduct Panel Finding of Fact #17.
[27] Judicial Conduct Panel Findings of Fact #18–21.

present position, or other fact concerning the candidate or an opponent."[28] This is not what the first sentence says.

¶ 40. The phrase "truth or falsity" in the first sentence modifies the words "reckless disregard" in the scienter part of the sentence. The phrase "truth or falsity" does not modify the core prohibition, namely that a candidate "shall not . . . knowingly misrepresent" a "fact concerning the candidate or an opponent.[29] The operative language of the Rule is not focused on the "truth or falsity" of individual "sentences" but rather whether a knowing misrepresentation was made. By misapprehending the application of the words "truth or falsity," in the first sentence, the two Panel judges incorrectly concluded that the first sentence of SCR 60.06(3)(c) does not apply to an objective misrepresentation of the facts regardless of the "truth or falsity" of each individual sentence.

¶ 41. Second, these two judges—and Justice Gableman—would read each of the sentences of the TV advertisement in isolation, as if the other sentences did not exist. They assert that because each sentence is, by itself, literally true, the four sentences together cannot amount to a false statement or a misrepresentation.

---

[28] Judicial Conduct Panel, slip op. at 14.

[29] Justice Gableman picks up this misconstruction of the rule's text in his brief at 4, emphasizing the words of SCR 60.06(3)(c) as follows:

"A candidate for a judicial office *shall not* knowingly or with reckless disregard for *the statement's truth or falsity* misrepresent the identity, qualifications, present position, or other *fact* concerning the candidate or an opponent."

This emphasis graphically shows the misinterpretation of the words of the first sentence in SCR 60.06(3)(c).

They ask us to read each sentence standing alone, denuded of any context or meaning.

¶ 42. The absurdity of that position is evident—it would allow speakers to knowingly convey false information, so long as they are fastidious in their punctuation, clever in the use of omitting a word, and tactical in using as few words as possible. We do not accept such a cramped view of what it means to make a "misrepresentation."

¶ 43. This view would ignore the normal way that people speak, read, and listen, the way in which people express meaning through language, and the way people understand not just words but sentences, and ultimately meaning. Construing each sentence as an isolated true statement rather than admitting of a single representation or statement, would adopt a view that ignores the way that human language and communication function.

¶ 44. Justice Gableman's position would allow for a thinly-sliced dissection of syntax to create "plausible deniability" after the fact, rather than acknowledging the only reasonable meaning communicated by the advertisement. Sadly, the approach offered in defense of the advertisement at issue here would approach the Code of Judicial Conduct in the manner of wordplay and linguistic gamesmanship, rather than as an embodiment of substantive ethical standards.

¶ 45. We refuse to approach the Code of Judicial Conduct in that manner or to adopt an approach to SCR 60.06(3)(c) that invites future judicial candidates to push and distort the content of advertising in judicial campaigns as far past truthful communication as the creative use of language may allow.

¶ 46. In contrast to Justice Gableman and two judges of the Judicial Conduct Panel, we determine that

several literally true sentences can be strung together to communicate an objectively false statement. The law has long acknowledged that to discern the meaning of language it must be read in context.[30] As Judge Learned Hand put it, "Words are not pebbles in alien juxtaposi-

---

[30] *See, e.g., State ex rel Kalal v. Circuit Court for Dane Co.,* 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110 (2003) ("Context is important to meaning . . . . [S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole . . . .").

Long-settled law established in defamation cases involving the First Amendment (including cases relating to "political speech") informs our decision in the present case. *Cf. In re Chmura, (Chmura II),* 626 N.W.2d 876, 885 (Mich. 2001) ("The language used in Canon 7(B)(1)(d) has its roots in defamation law. *New York Times* [*v. Sullivan,* 376 U.S. 254 (1964)]. Thus, we examine defamation case law for guidance in analyzing whether a judicial candidate knowingly, or with reckless disregard, has used or participated in the use of any form of public communication that is false.").

Courts have long declared that in determining whether statements were false (and therefore could be defamatory) the words used must be construed in the plain and popular sense in which they would naturally be understood. "In determining whether language is defamatory, the words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered. . . . *One may not dissect the alleged defamatory statement into non-defamatory parts and thus lose the vital overall meaning." Frinzi v. Hanson,* 30 Wis. 2d 271, 276–77, 140 N.W.2d 259 (1966) (emphasis added) (relating to political speech); *see also, e.g., Kaminske v. Wis. Cent. Ltd.,* 102 F. Supp. 2d 1066, 1081 (E.D. Wis. 2000) (same); *Dilworth v. Dudley,* 75 F.3d 307, 310 (7th Cir. 1996) (applying Wisconsin law) (same).

Defamation cases are instructive because, like potential judicial discipline for campaign speech under SCR 60.06(3)(c), defamation law imposes liability for false speech. Of course a judicial determination of whether statements made were, in fact,

tion; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part."[31]

¶ 47. Here, the four sentences at issue must be understood in the context in which they were offered, spoken in series in a matter of 10–15 seconds. Each sentence takes meaning from the sentence before and gives meaning to the sentence that follows. Accepting this common and necessary approach, we must agree with the Judicial Commission and with Judge Fine's concurrence that the advertisement communicated an objectively false statement.

¶ 48. The advertisement can reasonably be viewed only as communicating that Louis Butler's actions in representing Mitchell and finding a "loophole" led to Mitchell's release and his commitment of another crime. No other reasonable interpretation of the advertisement has been suggested.[32] The message communi-

false, is required. *See generally* 3 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 23:6 ("[T]he First Amendment does not permit liability for defamation unless the plaintiff also demonstrates that the defamatory statement was a false statement of fact."). A state imposition of consequences on speech implicates First Amendment considerations in both defamation and judicial discipline cases and both require a court to examine language to determine whether it expresses a false statement of fact.

[31] *Nat'l Labor Relations Bd. v. Federbush Co.*, 121 F. 2d 954, 957 (2d Cir. 1941).

[32] As Judge Fine put it, "The 'fact' asserted in the advertisement, by its language and the juxtaposition of that language, is that Justice Butler did something when he was a lawyer representing Mitchell that permitted Mitchell to commit another sex

cated was that Butler facilitated Mitchell's release and later crime. This message is objectively false. The four sentences misrepresented a fact concerning Louis Butler, Justice Gableman's opponent.

¶ 49. Another layer of misrepresentation is added to the advertisement's false narration by the visual presentation of case citation information.

¶ 50. At oral argument Justice Gableman's counsel suggested that a viewer could learn the facts for himself or herself by checking the citations and therefore the advertisement could not have contained a misrepresentation. Justice Gableman's attorney stated that the visuals allowed the viewer to conduct his or her own inquiry into the nature of the statements in the advertisement:

> Ultimately the ad provides the underlying factual references that demonstrate to the viewer, not after the fact when we're arguing about whether this ad is true or not, but to the viewer, the viewer has the references in the visual piece of the ad to determine what these statements relate to, and the viewer has the ability to conduct his or her own inquiry into the nature of the statements that are made.

crime." Judicial Conduct Panel, slip op. at 23 (Fine, J., concurring).

Judge Fine's concurrence explains that he posed several hypotheticals to Justice Gableman's counsel in the hearing before the Judicial Conduct Panel to determine whether Justice Gableman's counsel found any of them misrepresentations within the first sentence of SCR 60.06(3)(c). Some of Judge Fine's examples were blatant misrepresentations of fact within the meaning of SCR 60.06(3)(c). Nevertheless, in Justice Gableman's counsel's view, none was a misrepresentation. Judge Fine characterized counsel's view as "sophistry," bordering on " 'pleated cunning.' " Judicial Conduct Panel, slip op. at 26 (Fine, J., concurring) (quoted source omitted). We agree with Judge Fine.

¶ 51. That an attentive viewer was given this information does not change the fact that the advertisement itself misrepresented the facts, as is prohibited by SCR 60.06(3)(c). The prohibition against knowing misrepresentations does not depend on whether a viewer might later learn the truth.

¶ 52. More importantly, however, the case information provided by the advertisement is in and of itself objectively false and exacerbates the misrepresentation of the spoken words. The advertisement visually contains the following three citation references to cases: "State of Wisconsin CASE # 1984CF000250," "State of Wisconsin CASE # 1995CF952148," and "139 Wis. 2d 856." The first two references are circuit court case numbers for felony convictions of Reuben Lee Mitchell. The third is a citation to the disposition table of unpublished court of appeals decisions. The disposition table states that in the Mitchell case the court of appeals "reversed [the trial court conviction] and remanded [the case]."[33]

¶ 53. The advertisement does not contain the citation for the Wisconsin Supreme Court decision in the *Mitchell* case, 144 Wis. 2d 596 (1988). Justice Gableman knew that Butler continued to represent Mitchell in the supreme court and knew the contents of the supreme court decision. The Wisconsin Supreme Court reversed the decision of the court of appeals and affirmed Mitchell's conviction. Even for an industrious viewer who wished to "conduct his or her own inquiry," the advertisement omitted the key reference to the supreme court case that proves the misrepresentation contained in the advertisement itself. Thus the adver-

---

[33] The notation in the disposition table states that a petition for review is pending.

tisement misrepresented the court of appeals decision as the final decision on appeal, overturning Mitchell's conviction. A viewer who reviewed the citations referenced by the advertisement would conclude that the misrepresentation contained in the advertisement—that Butler's representation led to Mitchell's release and later crime—was true.

¶ 54. As we have stated previously, Justice Gableman knew that Louis Butler's representation in the court of appeals and Wisconsin Supreme Court, including finding a "loophole," did not facilitate Mitchell's release or allow Mitchell to commit a new offense. Accordingly, we conclude that Justice Gableman knowingly or with reckless disregard of the truth or falsity of the statements in the TV advertisement "misrepresent[ed] . . . [a] fact concerning . . . an opponent" in violation of the first sentence of SCR 60.06(3)(c).

¶ 55. In contrast to our conclusion, Judge Deininger's concurring opinion, Judicial Conduct Panel, slip op. at 17–19, concluded that the advertisement violated the second sentence of SCR 60.06(3)(c) and warranted condemnation even if formal discipline was not appropriate.[34] The second sentence of SCR

---

[34] At oral argument in our court, Justice Gableman's counsel urged that the four sentences were not even misleading under the second sentence of SCR 60.06(3)(c). Judge Deininger, one of the two judges who concluded that the advertisement did not violate the first sentence, asserted that Justice Gableman's counsel "virtually conceded at oral argument [before the Judicial Conduct Panel] that the advertisement is misleading." Judicial Conduct Panel, slip. op. at 17 (Deininger, J., concurring).

Judge Deininger wrote that "[t]he advertisement would be every bit as deserving of condemnation under SCR 60.06(3)(c) had Justice Butler's representation of Mitchell in fact resulted in Mitchell's release from prison." We agree with Judge Dein-

60.06(3)(c) provides: A candidate for judicial office should not knowingly make representations that, although true, are misleading . . . ." To fit within the second sentence, the statements must be "true" "representations" that are "misleading."

¶ 56. We disagree with Judge Deininger that the TV advertisement makes a true representation. It is not true that Mitchell went on to molest another child because Butler represented Mitchell and found a loophole. We agree with Judge Deininger that the TV advertisement was misleading. But contrary to what Judge Deininger says, misleading and misrepresentation are not mutually exclusive concepts. A misrepresentation is, by its very nature, misleading.

¶ 57. We conclude that by publishing the advertisement Justice Gableman willfully violated the first sentence of SCR 60.06(3)(c) and engaged in judicial misconduct pursuant to Wis. Stat. § 757.81(4)(a). By means of the advertisement, which he personally reviewed after personally reviewing the underlying facts, Justice Gableman knowingly or with reckless disregard for the statements' truth or falsity misrepresented a fact concerning an opponent within the meaning of SCR 60.06(3)(c).

¶ 58. We turn now to the argument that SCR 60.06(3)(c) and its application in the present case are unconstitutional under the First Amendment of the United States Constitution.

---

inger that the advertisement "confuse[d] the public with respect to the proper role of . . . lawyers in the adversary system," a misrepresentation which SCR 60.06(3)(c) cautions judicial candidates to avoid. Judge Deininger wrote that "[t]hat is precisely what the advertisement does, and what the advertisement was apparently intended to do." Judicial Conduct Panel, slip. op. at 17–18 (Deininger, J., concurring).

## III

¶ 59. Because we determine that the advertisement at issue here violates SCR 60.06(3)(c), we next address the question whether imposing discipline for this misrepresentation would violate the guarantee to freedom of speech provided by the First Amendment of the United States Constitution.[35]

¶ 60. The law is clear: The First Amendment does not protect a false statement that is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). The *New York Times* case adopted the "actual malice" standard: false statements made with actual malice, that is, with knowledge of their falsity or reckless disregard as to truth or falsity, are not protected speech. The actual malice standard distinguishes between on the one hand speech that is constitutionally protected, even if it contains some false statements, and on the other hand speech that the speaker knows to be false or speech uttered with reckless disregard for its truth or falsity, which is not protected by the First Amendment.

---

[35] "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

Article I, section 3 of the Wisconsin Constitution provides:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

¶ 61. *New York Times v. Sullivan*, 376 U.S. 254 (1964), first articulated this standard in a case of civil libel (defamation). Civil libel actions involve the First Amendment because state action (tort law and the court) imposes a sanction on speech. The "actual malice" standard was, however, quickly applied to a criminal prosecution for defamation in *Garrison v. Louisiana*, 379 U.S. 64 (1964), which was published in the same year and authored by the same Justice who authored *New York Times v. Sullivan*. The *Garrison* court recognized that "the paramount public interest in a free flow of information to the people concerning public officials" was at stake and described the kind of speech involved as "the essence of self-government."[36]

¶ 62. The United States Supreme Court explained in *Garrison* that an honest but inaccurate utterance may further the exercise of free speech and robust political discourse, while a knowing and deliberate or reckless

---

[36] *Garrison v. Louisiana*, 379 U.S. 64, 77, 75 (1964).

The Court saw no meaningful distinction between the interests implicated by civil defamation actions brought by private parties and enforcement of criminal libel law by the state:

> [W]e must decide whether, in view of the differing history and purposes of criminal libel, the *New York Times* rule also limits state power to impose criminal sanctions for criticism of the official conduct of public officials. We hold that it does.

> Where criticism of public officials is concerned, we see no merit in the argument that criminal libel statutes serve interests distinct from those secured by civil libel laws, and therefore should not be subject to the same limitations.

*Garrison*, 379 U.S. at 67. Thus the constitutional standard was the same, whether the cause of action was public or private and whether the sanctions imposed were civil or criminal. "Whether the libel law be civil or criminal, it must satisfy relevant constitutional standards." *Garrison*, 379 U.S. at 68 n.3.

falsehood used for political ends is at odds with the premises of a democratic government and the guarantee of free speech protected by the First Amendment:

> The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. *Cf.* Riesman, *Democracy and Defamation: Fair Game and Fair Comment I*, 42 Col[um]. L. Rev. 1085, 1088–1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . . " *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572. . . . Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[37]

¶ 63. Since 1964, when *New York Times v. Sullivan* and *Garrison v. Louisiana* first established "actual malice" as the constitutional standard, numerous cases have

---

[37] *Garrison v. Louisiana*, 379 U.S. at 75 (emphasis added).

invoked the rule that knowingly false statements are not sheltered from penalty by the First Amendment.[38]

[38] *See, e.g., Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743 (1983) ("Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." (internal citations omitted)); *Brown v. Hartlage,* 456 U.S. 45, 61–62 (1982) (striking down state law that "provided that a candidate for public office forfeits his electoral victory if he errs in announcing that he will, if elected, serve at a reduced salary;" citing defamation cases in the context of campaign speech regulation and reaffirming that "[o]f course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements"); *Herbert v. Lando,* 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials. '[T]here is no constitutional value in false statements of fact.'" (internal citation omitted)); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40 (1974) ("Under the First Amendment there is no such thing as a false idea. . . . But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (internal citations omitted)); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 44, 52 (1971) (Brennan, J., plurality opinion) (applying "actual malice" standard in a case brought by a private plaintiff, "extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous" and maintaining that "[c]alculated falsehood, of course, falls outside 'the fruitful exercise of the right of free speech'" (quoted source omitted)); *St. Amant v. Thompson,* 390 U.S. 727, 732 (1968) ("[N]either lies nor false communications serve the ends of the First Amendment"; applying the "actual malice" standard to

¶ 64. The *New York Times v. Sullivan* "actual malice" standard is explicitly incorporated in the lan guage of SCR 60.06(3)(c). The Rule prohibits a candidate for a judicial office from making misrepresentations about specified subjects either (1) *knowingly* or (2) with *reckless disregard* for the truth or falsity of the statement.

¶ 65. Justice Gableman agrees that even in what he calls "core political speech," the First Amendment does not protect "objectively false" statements.[39] The First

follow "the line which our cases have drawn between false communications which are protected and those which are not"); *Time Inc. v. Hill*, 385 U.S. 374, 389–90 (1967) (applying "actual malice" standard in case brought under state right of privacy statute, maintaining that "constitutional guarantees can tolerate sanctions against calculated falsehood without significant im pairment of their essential function. . . . [C]alculated falsehood should enjoy no immunity in the situation here presented us" (citing *Garrison v. Louisiana*, 379 U.S. at 75)); *Linn v. United Plant Guard Workers of Am. Local 114*, 383 U.S. 53, 62–63 (1966) (civil libel case arising in a labor organizing campaign and election; acknowledging "a congressional intent to encourage free debate on issues dividing labor and management" and that "cases involving speech are to be considered 'against the background of a profound . . . commitment to the principle that debate . . . should be uninhibited, robust, and wide-open . . . ' "; maintaining that "the most repulsive speech enjoys immunity *provided it falls short of a deliberate or reckless untruth*. . . . [M]alicious libel enjoys no constitutional protection in any context" (emphasis added)); *Weaver v. Bonner*, 309 F.3d 1312, 1320 (11th Cir. 2002) ("restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowl edge of falsity or with reckless disregard as to whether the statement is false—i.e., an actual malice standard").

[39] At oral argument, counsel for Justice Gableman took the position that "The First Amendment would not protect objec tively false statements. That's the crux of the issue in this case."

607

Amendment argument as presented by Justice Gableman therefore continues to focus on the determination we have already addressed—whether the advertisement at issue here knowingly misrepresented a fact about Justice Gableman's campaign opponent or, in the terms used by Justice Gableman, whether the advertisement was "objectively false."[40] Because we have already determined that the advertisement communicated a knowing misrepresentation of fact, and because we agree with Justice Gableman that objectively false speech may properly be disciplined, we conclude that the First

We note that this view is different from the more categorical position of Judge Fine's concurrence to the Judicial Conduct Panel's recommendation. Judge Fine concluded that "the only tribunal that may assess whether campaign speech is true or false is the electorate." Judicial Conduct Panel, slip op. at 29.

[40] It is not clear in Justice Gableman's brief whether he argues that SCR 60.06(3)(c) is unconstitutional on its face or only if applied to the advertisement in the instant case.

At certain points the brief implies that the law should prohibit judicial adjudication of the truth or falsity of *any* statement made in an election campaign, arguing that discipline "would be unconstitutional because of this Court's role in determining whether his speech is true or false." Brief of Respondent at 19.

At other points, Justice Gableman's brief, citing *Burson v. Freeman*, 504 U.S. 191, 198 (1992), and *Rickert v. State*, 168 P.3d 826, 827 (Wash. 2007), suggests that political campaign speech may be subject to some governmental regulation but that such regulation is then subject to "strict scrutiny" by the courts. *See* Brief of Respondent at 20.

At oral argument, Justice Gableman agreed that objectively false statements would not be protected by the First Amendment; the corollary to this argument is that SCR 60.06(3)(c) would be constitutional at least as applied to regulate "objectively false" statements.

608

Amendment does not prevent the court from imposing discipline on the basis of the advertisement in question here.

¶ 66. We are guided by the *Garrison* Court, which stated unequivocally: "Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas . . . . Hence the knowingly false statement and the false statement made with reckless disregard of the truth do not enjoy constitutional protection."[41]

¶ 67. Justice Gableman argues, however, that "defamation law is inapplicable in the context of constitutionally protected political speech," or "core political speech," at issue here.[42]

¶ 68. Justice Gableman's brief argues that the Judicial Commission has not cited authority bringing the "actual malice" (that is, defamation) analysis specifically to bear in the context of election campaigns. True. But neither has Justice Gableman cited any authority (other than a case decided by a significantly divided Washington Supreme Court) supporting his position that the clearly articulated, oft-adopted "actual malice" standard does not apply in campaign advertising cases.

¶ 69. Some tension exists in the language of First Amendment cases.

¶ 70. On the one hand, First Amendment cases often include rhetorical statements which, if read in

---

[41] *Garrison*, 379 U.S. at 75.

[42] *See* Brief of Respondent at 8.

Although Justice Gableman's position concedes that the First Amendment does not protect objectively false statements, he argues that the advertisement here was not objectively false. In effect, this argument restates the claim already addressed: that the four sentences do not contain a false statement or a misrepresentation of fact.

isolation, sound like absolute protection for free speech.[43] For example, the United States Supreme Court recently reminded us in *United States v. Stevens*, 130 S. Ct. 1577 (2010): "[T]he First Amendment's free speech guarantee does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. . . . Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it."[44]

¶ 71. On the other hand, while absolutist statements have a rhetorical value in emphasizing the commitment our constitution makes to freedom of speech, such absolutism is not the rule of law.[45] A clear line of authority exists protecting against dishonesty in public discourse and safeguarding open and fruitful public discourse,[46]

---

[43] *See, e.g., Wisconsin Right to Life, Inc.,* ("Our jurisprudence over the past 216 years has rejected an absolutist interpretation of those words, but when it comes to drawing difficult lines in the area of pure political speech between what is protected and what the Government may ban it is worth recalling the language we are applying . . . we give the benefit of the doubt to speech, not censorship. The First Amendment's command that 'Congress shall make no law . . . abridging the freedom of speech' demands at least that.").

[44] *United States v. Stevens,* 130 S. Ct. 1577, 1580, 1585 (2010).

[45] *See generally* 1 Rodney A Smolla, *Smolla and Nimmer on Freedom of Speech* §§ 2:10, 2:49, 2:50 (2006). "It should come as no surprise that the reality of absolutism does not match its rhetoric." *Id.,* § 2:50.

[46] We have a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *New York Times v. Sullivan,* 376 U.S. 254, 269 (1964).

namely the "actual malice" standard.[47] As the *Stevens* case reminds us, there continue to exist "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."[48] Relevant here is that knowingly uttered false speech is one such category of speech for which the government may impose sanctions without violating the First Amendment.[49]

¶ 72. The United States Supreme Court has not directly addressed how knowingly false statements, when made in a political campaign, may be regulated. There are cases addressing the regulation of campaign advertising in which false statements are not at issue. There also are cases allowing liability for knowingly false speech regarding public officials or public affairs, but not in the specific context of judicial discipline for political campaign advertising.

¶ 73. To discern the applicable law in this judicial discipline case, we must look below the surface of the rhetoric to the analysis and legal standards of the United States Supreme Court's interpretations of the First Amendment. Our analysis must "harmonize these two strains of law."[50] We proceed recognizing that

[47] *See Buckley v. Valeo*, 424 U.S. at 14–15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.").

[48] *Stevens*, 130 S. Ct. at 1584 (quoting *Chaplinsky v. New Hampshire*, 315 U. S. 568, 571–572 (1942)).

[49] *Stevens*, 130 S. Ct. at 1580 (recognizing defamation and fraud as among the areas where speech may be punished or prohibited without violating the First Amendment).

[50] *See Siefert v. Alexander*, No. 09–1713, slip op. at 11 (7th Cir. June 14, 2010).

"[p]rotecting judicial integrity is a government interest of highest magnitude, as is protecting the rights guaranteed by the First Amendment. Reconciling these two competing interests is no small feat . . . ."[51]

¶ 74. Justice Gableman's brief extracts language from cases interpreting federal statutes regulating political election campaigns, such as *Buckley v. Valeo*, 424 U.S. 1 (1976),[52] and *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007).[53] Justice Gableman's reliance on the federal campaign law cases does not support a categorically different analysis for regulation of campaigns and judicial discipline than for other First Amendment cases. The language from these cases is not persuasive to overcome the application of the "actual malice" standard to the present case for several reasons. Rather, the U.S. Supreme Court's holdings "do not necessarily forbid any regulation of a judge's speech. . . . [R]estrictions on judicial speech may, in some circumstances, be required

---

[51] *Siefert v. Alexander*, No. 09–1713, slip op. at 33 (7th Cir. June 14, 2010) (Rovner, J., dissenting in part).

[52] We agree with and apply the teaching of *Buckley v. Valeo*, 424 U.S. 1, 14 (1976): "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

[53] Significantly, the analysis in these cases is not about evaluating the truth or falsity of campaign communication, but about whether the communication falls within categories distinguished in federal election law, such as advertisements advocating election or defeat of candidates or those discussing issues.

by the Due Process Clause. This provides a state with a sufficient basis for restricting certain suspect categories of judicial speech, even political speech."[54] Knowingly false speech is such a "suspect category."

¶ 75. First, the United States Supreme Court in *Wisconsin Right to Life* elaborated a standard that is "objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect."[55] The objective standard approach to the assessment of political advertisements adopted in *Wisconsin Right to Life*, 551 U.S. at 469 (2007), is the very approach that we use in the instant case regarding campaign advertisements and judicial discipline. *See* ¶¶ 3, 18, 32, above.

---

[54] *Siefert v. Alexander*, No. 09–1713, slip op. at 19 (7th Cir. June 14, 2010).

[55] The United States Supreme Court rejected a test "for distinguishing between discussions of issues and [discussions of] candidates" that depends either the intent of the speaker or the subjective effect the communication had upon a listener. *Wisconsin Right to Life*, 551 U.S. at 467–68. The analysis instead focuses on the "substance of the communication." *Wisconsin Right to Life*, 551 U.S. at 469.

The United State Supreme Court maintained and applied this objective approach to determining what meaning was conveyed by the contested campaign speech in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 889–90 (2010) ("a court should find that [a communication] is the functional equivalent of express advocacy only if [it] is *susceptible of no reasonable interpretation other than* as an appeal to vote for or against a specific candidate") (emphasis added); *see also id.* at 898 ("While it might be maintained that political speech simply cannot be banned or restricted as a categorical matter . . . [*Wisconsin Right to Life, Inc.*] provides a sufficient framework for protecting the relevant First Amendment interests in this case.").

¶ 76. This objective standard approach in the United States Supreme Court cases not only comports with our approach to the language and substance of Justice Gableman's advertisement but also comports with the approach taken in Wisconsin defamation cases. As the Wisconsin Supreme Court stated in *Frinzi v. Hanson*, 30 Wis. 2d 271, 276–77, 140 N.W.2d 259 (1966), discussed at ¶ 46 n.30 above: "[W]ords must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered. . . . *One may not dissect the alleged defamatory statement into nondefamatory parts and thus lose the vital over-all meaning.*" Like the Court in *Wisconsin Right to Life*, we reject a focus on the speaker's intent and focus instead on the "substance of the communication" in the present case.

¶ 77. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990), the United States Supreme Court addressed an analogous issue. The Court had to decide "whether a reasonable factfinder could conclude that the statements [in a newspaper article] . . . imply an assertion" that was factually false. The argument was made that the statements were constitutionally protected as "opinion."

¶ 78. The *Milkovich* Court determined that the article's "connotation" was "sufficiently factual to be susceptible of being proved true or false. A determination whether petitioner lied in this instance can be made on a core of objective evidence . . . . Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Milkovich*, 497 U.S. at 21.

¶ 79. Similarly here, the fact communicated by the advertisement, "unlike a subjective assertion," was "an

articulation of an objectively verifiable event." *Milkov-ich*, 497 U.S. at 22. Because the legal standard we apply turns on establishing factual truth or falsity, the nature of the required determination is the same in the present case as in *Milkovich* and other defamation cases.

¶ 80. Second, in *Wisconsin Right to Life* the United States Supreme Court's bottom-line determination was whether "the ad is susceptible of no reasonable inter-pretation other than" the one that would make it subject to the prohibitions of federal campaign law. *Wisconsin Right to Life, Inc.*, 551 U.S. at 469–70; *id.* at 474 (the test is whether "the ads can only reasonably be viewed as advocating or opposing a candidate . . . ").[56]

---

[56] *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 890 (2010), followed the same method for determining what meaning was communicated by the contested film and whether that meaning brought it into conflict with the relevant statutory restriction. There, the Court applied the objective standard as "elaborated in [*Wisconsin Right to Life, Inc.*]" to reject the appellant's argument that the content of the con-tested film should be viewed narrowly and as falling outside the restrictions analyzed in that case governing communications that are "the functional equivalent of express advocacy."

In evaluating whether a communication did or did not violate the statutory prohibition, the Court viewed the commu-nication as a whole and in context, as we have reviewed the contested communication here. There, the Court observed how "the film would be understood by most viewers" and noted that "[t]he narrative may contain more suggestions and arguments than facts, but there is little doubt that the thesis of the film is that [then-Senator Clinton] is unfit for the Presidency." 130 S. Ct. at 890. In light of those observations, the Court concluded that "there is no reasonable interpretation of *Hillary* other than as an appeal to vote against Senator Clinton." *Id.*

Contrary to Justice Gableman's suggested approach, the Court in *Citizens United* did not analyze each sentence in

■■■■■■

We use this very same "no reasonable approach other than" basis in evaluating Justice Gableman's advertisement in this judicial discipline case. We conclude that the advertisement can reasonably be viewed only as communicating that Louis Butler's actions in representing Mitchell and finding a loophole led to Mitchell's release and his commitment of another crime. No other reasonable interpretation of the advertisement, reading its language in context, has been suggested.

¶ 81. Third, in *Wisconsin Right to Life, Inc.*, 551 U.S. at 469 (emphasis added), the Court focused on protecting "the liberty to discuss publicly *and truthfully* all matters of public concern . . . ." The focus of the First Amendment protection was not articulated by the Court in terms of "campaign speech," but in terms of discussing "all matters of public concern."[57] This language rebuts Justice Gableman's argument that the law takes a categorically different view in an election campaign context than in regulation of other public speech addressing important public matters. Furthermore, *Wisconsin Right to Life, Inc.* stated that the speech to

isolation. Rather, the Court employed the "no reasonable interpretation other than" approach, looking to the "thesis" of the communication when viewed as a whole. Likewise here, there is no doubt how the advertisement "would be understood by most viewers" or that its "thesis" was that Butler was somehow responsible for Mitchell's release. Our method of determining whether the advertisement violated the relevant prohibition in this case is entirely consistent with the approach for evaluating the content of regulated political speech in *Citizens United*.

[57] In this central statement of the holding, *Wisconsin Right to Life, Inc.* cites *Consolidated Edison Co. of N.Y. v. Public Service Commissionn of N.Y.*, 447 U.S. 530, 534 (1980).

be protected is that which "truthfully" addresses matters of public concern, not that which misrepresents the facts about such matters.

¶ 82. Fourth, while Justice Gableman quotes language in these cases that properly observes the vital role of protecting free speech in the context of political campaigns, the United States Supreme Court considered equally weighty First Amendment "political speech" values in the cases in which the "actual malice" standard was first developed. *Garrison*, for instance, was a case decided in the context of public criticisms of elected judges, addressing their fitness for office. *Garrison*, 379 U.S. at 64–65.[58]

¶ 83. Fifth, the "actual malice" standard is a demanding one, difficult to meet and highly protective of free speech. It is therefore a standard that can be applied to political campaigns in which the First Amendment "has its fullest and most urgent application."[59]

¶ 84. Sixth, because the First Amendment allows a court to adjudicate the questions of (1) speaking "knowingly," or (2) with "reckless disregard of the truth or falsity," as well as (3) the "truth or falsity" of statements in civil and criminal defamation cases, we see no reason why the First Amendment would raise a categorical bar

---

[58] The United States Supreme Court's analysis in the *Wisconsin Right to Life* case also undermines the suggestion that a sharp distinction can be maintained between formal campaign speech and speech that, although not directly addressing a candidate or campaign, implicates core First Amendment interests. *See Wisconsin Right to Life*, 551 U.S. at 457 ("the distinction between campaign advocacy and issue advocacy 'may often dissolve in practical application.' ") (quoted source omitted).

[59] *Buckley v. Valeo*, 424 U.S. 1, 15 (1976).

against adjudicating the same questions in a judicial disciplinary proceeding, the setting in which the issue arises here.

¶ 85. Seventh, differences between defamation law and the legal sanction of false speech in the present case do not provide a reasoned basis why the actual malice standard should not be applied here. A plaintiff in a traditional defamation action, unless proceeding on a theory of defamation per se, proves damages or a harm to reputation. Here, the Judicial Commission need not prove harm to reputation or damage. Knowing misrepresentations of an opponent cause harm to elections and damage judicial integrity. The interests the first sentence SCR 60.06(3)(c) protects are not private reputational interests but substantial well-recognized interests.

¶ 86. SCR 60.06(3)(c) protects the reputation, independence and integrity of Wisconsin's judicial elections and the judiciary. A state has a compelling interest in preserving the integrity of its election process."[60] "[A] state has a compelling interest in the integrity of its judiciary,"[61] and may "properly protect the judicial process from being misjudged in the minds of the public."[62] "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary,"[63] and "[t]he state's interest in the integrity of the judi-

---

[60] *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (quoting *Eu v. San Francisco Co. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).

[61] *Stretton v. Disciplinary Bd. f the Supreme Court of Penn.*, 944 F.2d 137, 142 (3d Cir. 1991).

[62] *Cox v. Louisiana*, 379 U.S. 559 (1965).

[63] *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 848 (1978) (Stewart, J., concurring).

ciary extends to preserving public confidence in the judiciary."[64] *See* ¶¶ 101–102, below.

¶ 87. For the reasons we have just set forth, we conclude that in accordance with the United States Supreme Court cases, the "actual malice standard" set forth in *New York Times, Garrison,* and subsequent cases is applicable in the instant case.

¶ 88. Our First Amendment analysis is supported by other courts. Some courts have applied much the same standard we use to evaluate political campaign material and to determine that provisions similar to SCR 60.06(3)(c) do not impermissibly curtail the freedom of speech either facially or as applied.[65]

¶ 89. We look first to *Rickert v. State of Washington, Public Disclosure Commission,* 168 P.3d 826 (Wash. 2007), upon which Judge Fine's concurring opinion at the Judicial Conduct Panel relied (although Judge Fine did not adopt all of the Washington court's analysis).

¶ 90. In *Rickert,* the nine Justices of the Supreme Court of Washington divided 4–1–4 in deciding the constitutionality of a state statute prohibiting a person from "sponsor[ing] with actual malice . . . [p]olitical advertising or an electioneering communication that

---

[64] *In re Chmura (Chmura I),* 608 N.W.2d 31, 40 (Mich. 2000):

> The state's interest in the integrity of the judiciary extends to preserving public confidence in the judiciary. The appearance of fairness and impartiality is necessary to foster the people's willingness to accept and follow court orders. The state's interest in protecting the reputation of the judiciary is also a compelling interest.

[65] Decisions of other courts have sometimes struck down as unconstitutional provisions that limit or penalize campaign speech, using standards encompassing a broader swath than is addressed by the first sentence of SCR 60.06(3)(c).

contains a false statement of material fact about a candidate for public office." *Rickert*, 168 P.3d at 828.

¶ 91. Four of nine justices joined a "majority" opinion that declared that any statute purporting to regulate "speech uttered during a campaign for political office" based on its content is subject to "strict scrutiny" analysis, under which the State must demonstrate that the statute "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " 168 P.3d 826, ¶ 8 (citing *Burson v. Freeman*, 504 U.S. 191 (1992)). These justices concluded that the statute in question did not meet this test.

¶ 92. Chief Justice Alexander concurred in the result, nevertheless concluding that "the majority goes too far" and that "the government . . . may penalize defamatory political speech." The Chief Justice viewed the Washington statute as also prohibiting nondefamatory speech.[66]

¶ 93. Four other justices dissented. They viewed the majority result as "an invitation to lie with impunity." *Rickert*, 168 P.3d 826, ¶ 30 (Madsen, J., dissenting). Rejecting the majority's interpretation and application of prior Washington cases, the dissenters concluded that "[t]he United States Supreme Court has made it absolutely clear that the deliberate lie in political debate has no protected place under the First Amendment because such lies do not advance the free political process but rather subvert it." *Rickert*, 168 P.3d 826, ¶ 32 (Madsen, J., dissenting) (citing *Garrison*, 379 U.S. at 75).[67]

---

[66] *Rickert*, 168 P.3d 826, ¶ 28.

[67] Other features of the analysis in *Rickert* also make the case inapplicable to our evaluation of SCR 60.06(3)(c) and the facts of the present case. In *Rickert*, the Washington court viewed the statute as "underinclusive" because it limited speech

¶ 94. We are neither bound by the majority result in *Rickert* nor persuaded by its reasoning. We conclude that the dissenting opinion in *Rickert* has the correct view of the First Amendment to be applied in the instant case: "[I]f the actual malice standard is met the speech falls within a class of speech that is not constitutionally protected. Therefore, a statute that proscribes speech under this standard does not have to meet the strict scrutiny/compelling governmental interest test . . . ." *Rickert*, 168 P.3d 826, ¶ 36.

¶ 95. We agree with the *Rickert* dissent that the strict scrutiny analysis is not necessary because the only speech prohibited by the first sentence of SCR 60.06(3)(c) is knowingly false speech, which the First Amendment does not shield from the imposition of sanctions.[68]

---

about a campaign opponent but included an exception for a candidate's speech about himself or herself. *Rickert*, 168 P.3d 826, ¶¶ 19–20. In contrast, SCR 60.06(3)(c) governs speech both about a candidate and his or her opponent.

The restriction addressed in *Rickert* was also enforced through an administrative body with members appointed by the governor, a procedural mechanism that the four-justice "majority" opinion viewed as impermissibly limiting a candidate's access to independent, de novo judicial review. *Rickert*, 168 P.3d 826, ¶¶ 22–24. Wisconsin's system of judicial discipline creates no such concerns. Grievances against judges are presented first to an independent Judicial Commission composed of a majority of public members (non-lawyers), judges, and lawyers. If the grievance is found to have merit, a complaint is filed and heard by a Judicial Conduct Panel composed of three court of appeals judges. The Panel makes recommendations to the supreme court, which makes the final disciplinary determination.

[68] SCR 60.06(3)(c) also cannot be considered presumptively unconstitutional as a prior restraint on speech. "In First Amendment jurisprudence, prior restraints are . . . traditionally

621

¶ 96. In any event, SCR 60.06(3)(c) can withstand a strict scrutiny analysis. The first sentence of the rule is necessary to protect the reputation, independence, and integrity of Wisconsin's judiciary. These are compelling interests. A state may "properly protect the judicial process from being misjudged in the minds of the public."[69] "[T]here could hardly be a higher governmental interest than a State's interest in the quality of its judiciary,"[70] and "[t]he state's interest in the integrity of the judiciary extends to preserving public confidence in the judiciary."[71] The compelling interest in judicial integrity places it "beyond doubt that states have a

contrasted with 'subsequent punishments,' which impose penalties on expression after it occurs." 2 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* ¶ 15:1.

In *Citizens United*, the United States Supreme Court suggested that the regulatory scheme at issue there, although "not a prior restraint on speech in the strict sense," "function[ed] as the equivalent of prior restraint" "[A]s a practical matter," because "a speaker wishing to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission . . . ." *Citizens United*, 130 S. Ct. at 882. The FEC employed an "11–factor balancing test" to determine whether a communication was prohibited. No similar complexity or regulatory scheme for prior approval is involved in SCR 60.06(3)(c).

[69] *Cox v. Louisiana*, 379 U.S. 559 (1965).

[70] *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978) (Stewart, J., concurring).

[71] *In re Chmura (Chmura I)*, 608 N.W.2d 31, 40 (Mich. 2000):

> The state's interest in the integrity of the judiciary extends to preserving public confidence in the judiciary. The appearance of fairness and impartiality is necessary to foster the people's willingness to accept and follow court orders. The state's interest in protecting the reputation of the judiciary is also a compelling interest.

compelling interest in developing, and indeed are required by the Fourteenth Amendment to develop . . . independent-minded and faithful jurists."[72]

¶ 97. Furthermore, the State "indisputably has a compelling interest in preserving the integrity of its election process."[73] The United States Supreme Court has recently reaffirmed the important governmental interest in "providing information to the electorate" and in political campaigns.[74] Voters must "be able to evaluate the arguments to which they are being subjected,"[75] and the transparency of information provided in campaign advertisements "enables the electorate to make informed decisions and give proper weight to different speakers and messages."[76]

---

[72] *Siefert v. Alexander*, No. 09–1713, slip op. at 8 (7th Cir. June 14, 2010) (citing, inter alia, *Republican Party of Minn. v. White*, 536 U.S. 794, 796 (2002) (Kennedy, J., concurring); *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2259 (2009)).

[73] *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (quoting *Eu v. San Francisco Co. Democratic Central Committee*, 489 U.S. 214, 231 (1989)); *see also Brown v. Hartlage*, 456 U.S. 45, 61, (1982) (recognizing the "state interest in protecting the political process from distortions caused by untrue and inaccurate speech").

[74] *Citizens United*, 130 S. Ct. at 914 (upholding disclosure requirements under "exacting scrutiny" analysis, which is less demanding than "strict scrutiny" and requires a "substantial relation" between the burden on political speech and a "sufficiently important" governmental interest).

[75] *Citizens United*, 130 S. Ct. at 915.

[76] *Citizens United*, 130 S. Ct. at 916 (recognizing the "sufficiently important" governmental interests passing the "exacting scrutiny" analysis to uphold disclaimer and disclosure requirements which "may burden the ability to speak, but . . .

¶ 98. Knowing misrepresentations are "no essential part of any exposition of ideas . . . ."[77] They may undermine the electorate's ability to "make informed decisions" and "give proper weight" to competing speakers and messages.[78] The open, even contentious exchange of ideas in an election need not permit knowingly false statements, which undermine rather than serve the First Amendment's protection for political debate.[79]

¶ 99. SCR 60.06(3)(c) serves compelling state interests. "A prime purpose of judicial discipline is to foster public trust and confidence in the judicial system";[80] "[d]iscipline is designed to restore and maintain the dignity, honor, and impartiality of the judicial office."[81] By deterring the use of knowingly false statements about candidates in a judicial election, the Code fosters an electoral process in which the public can have

'impose no ceiling on campaign-related activities and 'do not prevent anyone from speaking.' ").

[77] *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (citing *Chaplinsky v. New Hampshire*, 315 U. S. 568, 572 (1942)).

[78] *See Citizens United*, 130 S. Ct. at 915–16.

[79] *Vanasco v. Schwartz*, 401 F. Supp. 87, 100 (E. & S.D.N.Y. 1975) (concluding that provisions of New York campaign code were unconstitutional because they were overbroad and reached past the "actual malice" standard; *recognizing that* "[n]othing in our decision downgrades the state's legitimate interest in insuring fair and honest elections. Undoubtedly, deliberate calculated falsehoods when used by political candidates can lead to public cynicism and apathy toward the electoral process.").

[80] *In re Ziegler*, 2008 WI 47, ¶¶ 5, 35, 309 Wis. 2d 253, 750 N.W.2d 710.

[81] *Id.* at ¶ 35 ("Discipline is not imposed to punish the individual judge. Rather, the purpose of judicial discipline, like the purpose of the Code of Judicial Conduct, is to protect our court system and the public from misconduct.").

greater confidence and a climate in which the public can elect the candidate of their choice based on correct information.

¶ 100. Thus, numerous compelling interests are served by SCR 60.06(3)(c) and its enforcement through judicial discipline proceedings. The necessity of protecting these interests through reasonable enforcement of the Code of Judicial Conduct is apparent and well recognized. The interests protected relate to both the integrity and reputation of the judiciary and the integrity of the election process, and the rule reaches only those whose conduct implicates both the judiciary and elections. The Rule applies evenly to all candidates for judicial office and is not overinclusive or underinclusive. Most importantly, SCR 60.06(3)(c) prohibits only statements made under the "actual malice" standard, a narrow category of speech not protected by the First Amendment. The first sentence of SCR 60.06(3)(c) therefore passes a strict scrutiny analysis.

¶ 101. We also examine the two *In re Chmura* cases decided by the Michigan Supreme Court.[82] There, the constitutionality of Canon 7(B)(1)(d) of Michigan's Code of Judicial Conduct was challenged. The Canon reached much more broadly than SCR 60.06(3)(c), restricting "communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation . . . or omits a fact necessary to make the statement considered as a whole not materially misleading . . . ."[83] The Michigan court held that the Canon was overbroad and therefore facially unconstitutional.

---

[82] *In re Chmura* (*Chmura I*), 608 N.W.2d 31 (Mich. 2000); *In re Chmura* (*Chmura II*), 626 N.W.2d 876 (Mich. 2001).

[83] *Chmura I*, 608 N.W.2d at 32 n.1.

The court gave the rule a "saving construction," narrowing it only "to prohibit a candidate for judicial office from knowingly or recklessly using or participating in the use of any form of public communication that is false."[84]

---

[84] *Chmura I*, 608 N.W.2d at 43.

Similar to the outcome of *Chmura I* is *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002), in which the court struck down provisions of Georgia law that were not narrowly tailored to the compelling interests and that reached too broadly, stating that "to be narrowly tailored, restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false, i.e., an actual malice standard."

Using similar reasoning, in *Vanasco v. Schwartz*, 401 F. Supp. 87, 95 (E. & S.D.N.Y. 1975), a panel convened of judges of the federal Eastern and Southern Districts of New York "concluded that the deliberate calculated falsehood does not enjoy constitutional protection even when made during the course of a political campaign and when it involves a proceeding by the Board [of Elections] rather than a civil defamation suit or criminal prosecution." In analyzing the application of the "actual malice" standard, the court stated:

> It is important to emphasize ... that any state regulation of campaign speech must be premised on proof and application of a Times "actual malice" standard. We are not dealing with defamation suits brought by "private individuals" where a standard somewhat less than that required by *Times* would be appropriate. To the contrary, Board proceedings concern regulation of the speech of "public officers" and "public figures" during campaigns for political office where the constitutional guarantee of freedom of speech "has its fullest and most urgent application." With this proposition in mind, we can agree with the Board's argument that calculated falsehoods are of such slight social value that no matter what the context in which they are made, they are not constitutionally protected.

*Vanasco v. Schwartz*, 401 F. Supp. 87, 92 (E. & S.D.N.Y. 1975).

¶ 102. Thereafter, in *Chmura II*, the Michigan Supreme Court applied its rewritten narrower rule.[85] Reckoning with the concept of falsity in a political advertisement, the Michigan Court rejected application of the "substantial truth" doctrine from tort law "because a judicial candidate's communication could be interpreted in 'numerous, nuanced ways.' " *Chmura II*, 626 N.W.2d at 887 (quoted source omitted). The court then reviewed the substance of the contested advertisements and found them "substantially true despite their inaccuracies,"[86] thus declining to impose discipline. A

*See also District One Republican Comm'n v. District One Democrat Comm'n*, 466 N.W.2d 820, 828, 829 (N.D. 1991) (applying a prohibition that "[n]o person may knowingly sponsor any political advertisement or news release that contains any assertion, representation, or statement of fact, including information concerning a candidate's prior public record, which the sponsor knows to be untrue, deceptive, or misleading;" holding that "sensitive First Amendment considerations for political speech dictated that stringent mental culpability requirement and that the constitutional requirements necessary to impose liability for defamation of a public figure ["actual malice" standard] also established a minimum culpability for political speech;" determining the required "knowing" mental state was not established in the case before it).

[85] *In re Chmura* (*Chmura II*), 626 N.W.2d 876 (Mich. 2001).

[86] *Chmura II*, 626 N.W.2d at 897. The court determined that in analyzing whether a judicial candidate had violated the Code restriction on false campaign communication, "the public communication must be analyzed to determine whether the statements communicated are literally true. . . . [I]f the communication conveys an inaccuracy, the communication as a whole must be analyzed to determine whether 'the substance, the gist, the sting,' of the communication is true despite the inaccuracy. In other words, we must decide whether the communication is substantially true." *Chmura*, 626 N.W.2d at 887. Were we to

dissent agreed with the standard but disagreed with its application to some of the advertisements at issue. No justice determined that the application of the standard would present a First Amendment problem.

¶ 103. In other words, once the Michigan Rule was properly narrowed to track the "actual malice" standard, the Michigan Court had no constitutional qualms in applying the rule to prohibit campaign communications which were false and made knowingly or with reckless disregard of the truth or falsity of the communications.

¶ 104. In *Pestrak v. Ohio Elections Commission*, 926 F.2d 573, 577 (6th Cir. 1991), the United States Court of Appeals evaluated portions of an Ohio statute which proscribed "only the knowing making of false statements" and determined that these "clearly come within the Supreme Court holdings in *Garrison v. Louisiana* and *New York Times v. Sullivan.*"

¶ 105. These cases demonstrate that false speech, even false political speech, "does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth."[87] *Pestrak* comports

apply that standard in the present case, it is clear that the advertisement was substantially and objectively false.

The *Chmura I* case also determined that in evaluating whether a candidate recklessly disregarded the truth, a contested communication was to be analyzed using an "objective" standard, by which it meant a standard that did not require a showing that the speaker "actually entertain[ed] serious doubts" as to the truth of the statement. *Chmura I*, 608 N.W.2d at 44. This standard sanctions more, rather than less speech than our interpretation of SCR 60.06(3)(c) allows.

[87] *Pestrak*, 926 F.2d at 577. The court in *Pestrak* went on to determine that enforcement of the measure by fines or cease and desist orders issued by an administrative body was uncon-

with our view of the applicable law, namely, that SCR 60.06(3)(c) supports the imposition of discipline using the "actual malice standard" for false campaign speech without violating the First Amendment.

¶ 106. We conclude that the rule emphasized in *Garrison v. Louisiana* and explicitly maintained in cases thereafter, including in the context of political speech, is determinative here: False statements knowingly made or false statements made in reckless disregard of their truth or falsity are not protected by the First Amendment. Because SCR 60.06(3)(c) incorporates this standard, its application to judicial discipline in the present case does not violate the First Amendment.

* * * *

¶ 107. We conclude that by publishing the advertisement at issue, Justice Gableman willfully violated the first sentence of SCR 60.06(3)(c) and engaged in judicial misconduct pursuant to Wis. Stat. § 757.81(4)(a). By means of the advertisement that he personally reviewed and checked out, Justice Gableman knowingly or with reckless disregard for the statements' truth or falsity misrepresented a fact concerning an opponent within the meaning of SCR 60.06(3)(c).

¶ 108. We further conclude that the rule emphasized in *Garrison v. Louisiana* and explicitly maintained in cases thereafter is determinative here: False statements knowingly made or false statements made in

---

stitutional because the administrative nature of the enforcement provisions did not meet the "clear and convincing" evidentiary burden as imposed administratively and because the cease and desist orders amounted to an impermissible prior restraint rather than a subsequent punishment. *Pestrak*, 926 F.2d at 578.

reckless disregard of their truth or falsity are not protected by the First Amendment. Because SCR 60.06(3)(c) incorporates this standard, its application to judicial discipline in the present case does not violate the First Amendment.

¶ 109. It is clear that the court is equally divided regarding the disposition of the matter. No four justices have voted either to accept or to reject the Judicial Conduct Panel's recommendations, nor have four justices agreed on Justice Gableman's motion for summary judgment or any disposition of the Judicial Commission's complaint. No action can therefore be taken on the Panel's recommendation. The Judicial Commission has failed to obtain a majority of justices to reject the recommendation of the Panel. Under these circumstances, the Panel is relieved of any further responsibility in this matter, and we remand the matter to the Judicial Commission with directions to request a jury hearing, in accord with Wis. Stat. §§ 757.87, 757.89, and 805.08.

¶ 110. For the reasons set forth we write separately.